# EXHIBIT 23

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3

4   MARIA LIN YURIAR; and JUAN    )
    GUILLERMO,                    )
5                                 )
            Plaintiffs,           )
6                                 )   Case No.:
        vs.                       )   4:23-cv-06438-KAW
7                                 )
    STATE OF CALIFORNIA; BASIR    )
8   QURISHI; and DOES 3-10,       )
    Inclusive,                    )
9                                 )
            Defendants.           )
10  _____)

11

12

13

14

15        VIDEOTAPED/VIDEOCONFERENCED DEPOSITION OF

16                  ALEXIS PEREZ-ROJAS

17                  Dublin, California

18               Friday, July 11, 2025

19

20

21

22

23  Reported by:
    LAURA L. CORNING
24  FCRR
    California CSR No. 8363
25  JOB No. 18224

1    A.    That's correct.

2    Q.    And, obviously, the other incidents where you

3  saw people with other weapons in their hands, you also

4  did not fire in those incidents?  Is that correct as

5  well?

6    A.    Correct.

7    Q.    In terms of your training with respect to

8  deadly force, were you trained that deadly force

9  essentially should only be used if there's an imminent or

10  immediate threat of death or serious bodily injury?

11    A.    Yes.

12    Q.    And were you trained to give a verbal warning

13  before using deadly force when feasible?

14    A.    Yes.

15    Q.    So let's talk a little bit about the incident.

16         Were you solo in your patrol car at the time

17  you heard the radio dispatch?

18    A.    Yes.

19    Q.    And what information did you initially hear?

20    A.    An anonymous reporting party stating that she

21  heard a crash in the area of 163rd Avenue and East 14th

22  Street off of the 580 eastbound off-ramp.  She described

23  what she heard was a crash and about three or four

24  subjects running away from the vehicle.

25    Q.    Any other information you recall other than

Alexis Perez-Rojas

1   that?

2        A.    No.

3        Q.    And did you indicate to dispatch that you

4   would respond?

5        A.    Yes.

6        Q.    Do you have a general recollection of where

7   you were when you heard the dispatch?

8        A.    Yes.

9        Q.    Where were you generally?

10       A.    I was traveling northbound on East 14th Street

11  just south of 163rd Avenue.

12       Q.    Do you have an estimate as to how long it took

13  you to get to the scene from where you were?

14       A.    From the time of dispatch is what you're

15  asking?

16       Q.    Yes.

17       A.    I would say about 10 to 20 seconds.

18       Q.    So you were very close?

19       A.    Yes.

20       Q.    Did you respond with lights and sirens?

21       A.    No.

22       Q.    Can you just generally tell me what street or

23  streets you took to respond from where you were when you

24  heard the dispatch?

25       A.    I made the first right-hand turn, which is an

1    eastbound turn, onto 163rd Avenue from East 14th Street.

2         Q.    So would you -- would you have been going

3    eastbound on 163rd?

4         A.    Yes.

5         Q.    And at some point did you see something that

6    you thought was potentially related to the call?

7         A.    Yes.

8         Q.    What did you see initially?

9         A.    A marked black-and-white CHP vehicle parked in

10   the middle of the block with red and blue lights on.

11        Q.    Anything else that you initially saw?

12        A.    Just a CHP vehicle.

13        Q.    Did you get any additional radio

14   communications or dispatches, other than what you've told

15   me so far, before you got out of your car?

16        A.    No.

17        Q.    Did you make any other dispatches or make any

18   communications over your police radio before you got out

19   of your car?

20        A.    Just that I accept dispatch, and when I

21   arrived on scene.

22        Q.    Okay.  Just to let dispatch know you got on

23   scene?

24        A.    Yes.

25        Q.    At some point did you see the car that had

Alexis Perez-Rojas

```
 1        Q.    So from the time they come into your view on

 2   your camera to the time you hear your shot is

 3   approximately 14 seconds?

 4        A.    From my eyes.  Not directly from my camera.

 5        Q.    Did you hear anything being said by either one

 6   of them before you saw them?

 7        A.    From somebody else.

 8        Q.    What did you hear from somebody else?

 9        A.    Someone saying, "Diego, stop.  Diego, stop."

10        Q.    Did you know who was saying that?

11        A.    At the time, no.

12        Q.    Did you know who Diego was at the time?

13        A.    No.

14        Q.    Anything else that you heard before seeing

15   them?

16        A.    No.

17        Q.    During the approximate 14 seconds between

18   seeing them and you firing your first shot, did you hear

19   the CHP officer say anything?

20        A.    No.

21        Q.    For example, did you hear the CHP officer give

22   any commands?

23             MR. THOMAS:  Asked and answered.

24             You can answer.

25   //
```

Alexis Perez-Rojas

1    A.    No.

2    Q.    And you believe you would have been watching

3    them for approximately 10 seconds or so before you saw

4    the gun?

5    A.    About 10 seconds.

6    Q.    So was seeing the gun one of the factors in

7    your totality of the circumstances in informing your

8    decision to shoot?

9    A.    Yes.

10    Q.    At some point you heard a shot?

11    A.    Yes.

12    Q.    And was that -- how much time passed from you

13    seeing the gun to you hearing the shot?

14    A.    About a second or two.

15    Q.    And was hearing the shot, again, one of the

16    factors in your totality of the circumstances in your

17    decision to shoot?

18    A.    Yes.

19    Q.    Why was hearing the shot an -- an important

20    factor for you in your decision to shoot?

21    A.    Because I didn't know if the shot was directed

22    at me or the CHP officer.  It was in very close

23    proximity.

24    Q.    Okay.  And then how much time passed from

25    hearing the shot to you firing your shot?

1  some lights from the apartment complex that were also not

2  LED.

3       Q.    From your perspective, could you clearly see

4  them?

5             MR. THOMAS:  Objection.  Vague.

6             You mean the lights or the officer and the

7  suspect?

8             MR. GALIPO:  Good point.  I was talking about

9  the officer and the suspect, but we could break it down

10  if you want.

11            MR. THOMAS:  You can answer if you understand

12  the question.

13            THE WITNESS:  I could clearly see them, yes.

14  BY MR. GALIPO:

15       Q.    You could clearly see them?

16       A.    Yes.

17       Q.    I take it your eyesight, given that you are

18  young -- at least from my perspective you are young -- is

19  pretty good, as far as you know?

20       A.    Yes.

21       Q.    When you first saw the individual on the CHP

22  officer, what was their body position relative to each

23  other?

24       A.    The CHP officer was on his back lying with his

25  face and belly up, and the suspect was on a mount on top

1   of him, hip to hip, with the suspect's legs and knees

2   touching the concrete.

3        Q.   And with respect to CHP officer's head, do you

4   know what compass direction that was direction [sic]?

5        A.   The top of his head was facing northbound down

6   the driveway.

7        Q.   And would his feet generally be southbound?

8        A.   Yes.

9        Q.   And when you fired your shots, which direction

10  were you firing?

11       A.   In a northbound direction.

12       Q.   Was there any east- or westerly component to

13  that?

14       A.   No.

15       Q.   You were firing pretty much due north?

16       A.   Close to, yes.

17       Q.   Did you see any injuries on anyone before you

18  fired your shots?

19       A.   No.

20       Q.   Where were you aiming when you fired your

21  shots?

22       A.   The suspect's center mass.

23       Q.   And what was his center mass from your

24  perspective?

25       A.   The middle of his chest.

Alexis Perez-Rojas

 1    them?

 2         A.    I was not.

 3         Q.    Let me ask you a few questions about the gun

 4    that you saw.  Do you recall what color it was?

 5         A.    It appeared to be silver to me at the time.

 6         Q.    Could you tell if anyone had their hand on the

 7    gun?

 8         A.    Both parties had their hands on the gun.

 9         Q.    When you say "both parties," you mean the CHP

10    officer and the other individual?

11         A.    Yes.

12         Q.    How could you tell that the CHP officer had

13    his hand on the gun?

14         A.    I could tell what appeared to me his right

15    hand was on the pistol grip, his left hand was trying to

16    establish another grip, and the other pair of hands --

17    which were the suspect's hands -- were on the slide and

18    barrel.

19         Q.    So let's just stick with the CHP officer for a

20    minute, and then we'll go to the other individual.  I

21    just want to make sure I'm understanding your testimony.

22             The CHP officer had his right hand on the

23    pistol grip?  Am I getting that correct?

24         A.    That's what it appeared to me, yes.

25         Q.    And is that the -- is that the part of the gun

1    A.    I could not at the time.

2    Q.    Do you have an estimate as to how far the CHP

3   officer's left hand was from the gun, again, during this

4   one to three seconds?

5    A.    I don't.

6    Q.    Okay.  Let's talk about the other person's

7   hands during this one- to three-second period before you

8   fired.  Where -- you could see one or both of the other

9   individual's hands?

10    A.    At the time it appeared to be both his hands.

11    Q.    Both his hands where in relation to the gun?

12          MR. THOMAS:  Objection.  Vague as to time.

13   I'm sorry.  I wasn't following.  What --

14          MR. GALIPO:  Oh, that's okay.  I'm talking

15   about the time frame of the approximate one to three

16   seconds that he saw the gun before he fired.

17          MR. THOMAS:  Okay.  Do you understand the

18   question?

19          THE WITNESS:  Yes.

20          Yeah.  It was on the slide closer to the

21   trigger guard.  So on top of the gun.  If my hand is the

22   gun, it was (indicated.)

23   BY MR. GALIPO:

24    Q.    Okay.  So his right hand -- the individual's

25   right hand would have been touching the gun and over a

1    portion of the gun?

2         A.   I don't recall if it was his right or left

3    hand.

4         Q.   One of his hands?

5         A.   Yes.

6         Q.   But you're not sure which one?

7         A.   That's correct.

8         Q.   In this one to three seconds that you were

9    seeing the gun before you fired, did you see any punches

10   being thrown during this one or [sic] three seconds?

11        A.   Yes.

12        Q.   Who was throwing punches?

13        A.   The suspect.

14        Q.   So you were seeing punches being thrown at the

15   same time you're saying you saw his hand on the gun,

16   meaning the suspect's hand on the gun?

17        A.   Yes.

18        Q.   And what hand was the suspect using to throw

19   punches?

20        A.   I don't recall.

21        Q.   How many punches do you think that you saw

22   being thrown?

23             MS. SULLIVAN:  Vague.  In the one to three

24   seconds or just in general?  Sorry, Dale.

25             MR. GALIPO:  That's okay.  I'll break it down.

Alexis Perez-Rojas

```
1        A.   Yes.

2        Q.   Did you see a gun in his hand when you fired

3   your first shot?

4             MS. SULLIVAN:   Whose hand?

5             MR. THOMAS:   Vague.   Asked and answered.

6             You can answer.

7   BY MR. GALIPO:

8        Q.   Did you see a gun in the hand of the

9   individual you were firing at when you fired your first

10  shot?

11       A.   Yes.

12       Q.   Did you see a gun in [sic] the individual you

13  were firing at when you fired your second shot?

14       A.   It was a very rapid succession.   I don't

15  recall.

16       Q.   So you're saying that when you fired your

17  first shot, the individual was turned towards the south,

18  and you saw a gun in one of his hands?

19       A.   Yes.

20       Q.   And which hand did you see a gun in when you

21  fired your first shot?

22       A.   I don't recall.

23       Q.   Is that why you fired:  because you saw a

24  gun in his hand?

25            MR. THOMAS:  Objection.  Misstates testimony.
```

1    Asked and answered.

2              You can answer again.

3              THE WITNESS:  Along with the hearing the

4    fire -- the shot being fired -- a muzzle flash, and

5    seeing the gun, yes.

6    BY MR. GALIPO:

7         Q.   Okay.  So hearing the shot was also a factor

8    in your mind in shooting?

9         A.   Yes.

10        Q.   Did you ever hear the CHP officer say, he's

11   taking my gun or, he's got my gun, or words to that

12   effect?

13        A.   No.

14        Q.   Did you hear anyone say, drop it, at any time

15   or, drop it or I'll shoot?

16        A.   No.

17        Q.   What did you do after you fired your two

18   shots?  What did you do next in chronological order?

19        A.   Assess the situation.  I ordered the suspect

20   to get and stay on the ground.

21        Q.   And was the suspect on the ground at that

22   point?

23        A.   Yes.

24        Q.   What position was the person in on the ground?

25        A.   From what I can recall, on his back and on

1   gun and heard the shots, your thinking was that you were

2   going to try to physically intervene to help the CHP

3   officer in the physical altercation.

4           Did I understand you correctly?

5           MR. THOMAS:  Same objections.

6           You can answer.

7           THE WITNESS:  No.  My point was just -- just

8   intervene.  I didn't know whether it was going to be

9   physical or anything at that time until I walked up

10  closer to them.

11  BY MR. GALIPO:

12      Q.   Were you considering the possibility of

13  physically intervening?

14          MR. THOMAS:  Same objections.

15          You can answer.

16          THE WITNESS:  I was --

17          MS. SULLIVAN:  Join -- I'm sorry.  Join and

18  vague as to time.

19          THE WITNESS:  It all happened so fast.  So I

20  was considering a lot of possible options as I walked up.

21  BY MR. GALIPO:

22      Q.   What options were you considering?

23      A.   Well, prior to walking up, I mean, the CHP

24  officer's head was bouncing off the concrete.  So I could

25  hear that.  So it was a pretty bad serious bodily injury

Alexis Perez-Rojas

1    A.    Yes.

2    Q.    Did you notice that the CHP officer's arms

3  were up in a defensive position at some point during the

4  time of the punches?

5    A.    At some point.

6    Q.    And was it your impression that the CHP

7  officer was trying to block some of the punches?

8    A.    Yes.

9    Q.    Did you see muzzle flash associated with the

10 first shot?

11   A.    Yes.

12   Q.    And if we can go to the top of Page 45?

13   A.    Okay.

14   Q.    Do you see in the first four lines about the

15 reference to you hearing the first shot and seeing the

16 muzzle flash?

17   A.    Yes.

18   Q.    You said, or they wrote down "Uh-huh," but you

19 say you were trying to say yes?

20   A.    Yes.

21   Q.    And then the next question if you see by the

22 detective:  "And then about how long from there did you

23 fire?"  And you say, "I would say less than a second."

24       Do you see that?

25   A.    Yes.

1   the vehicle was still running.

2       Q.    So when you arrive on scene you see the CHP

3   patrol vehicle parked at a certain angle.  Did you at

4   that point park your patrol vehicle and exit your vehicle

5   to investigate what was going on?

6       A.    Yes.

7       Q.    And you already testified that once you exited

8   your patrol vehicle, you heard someone yelling, "Diego

9   stop.  Diego, stop."  Do you recall that?

10      A.    Yes.

11      Q.    At that point did you look over to the area

12  where, I guess, the yelling was directed to?

13      A.    Yes.

14      Q.    What did you see at that point in time?

15      A.    I saw the suspect on top of Officer Qurishi

16  and actively assaulting him and punching him.

17      Q.    Is it your understanding that the suspect's

18  name, who is the decedent now, was Mr. Yuriar?

19      A.    Are you talking about at the time or now?

20      Q.    Now.

21      A.    No.

22      Q.    And when you say mounted -- Mr. Yuriar was

23  mounted on Officer Qurishi, you have explained that

24  earlier that basically he was straddled on top of him,

25  like hip to hip, with knees on both sides of him,

1    correct?

2         A.    Correct.

3         Q.    And they were face-to-face?

4         A.    Yes.

5         Q.    And I believe you observed Mr. Yuriar punching

6    Officer Qurishi somewhere between five and seven or eight

7    times?

8         A.    Yes.

9         Q.    When Mr. Yuriar was punching Officer Qurishi,

10   was he doing it with balled fists?

11        A.    Yes.

12        Q.    Okay.  And he was using both hands to punch

13   Officer Qurishi; is that correct?

14        A.    Yes.

15        Q.    The punching that you observed by Mr. Yuriar

16   to Officer Qurishi, what area was he punching?

17        A.    His entire head and face area and upper chest

18   area.

19        Q.    And was that concerning to you?

20        A.    Yes.

21        Q.    Why?

22        A.    Well, while he was punching him, when I first

23   initially saw it, I saw Officer Qurishi's head bouncing

24   off the concrete and I could hear something from it and I

25   know that can cause serious bodily injury, loss of

Alexis Perez-Rojas

1    consciousness, and possible loss of eyesight based on the

2    proximity of punches to his eyes.

3         Q.   Did you see all of that before you saw a

4    struggle with the firearm?

5         A.   Yes.

6         Q.   So before you saw the struggle with the

7    firearm, in your mind, you believed that there was some

8    potential for serious bodily injury or death to Officer

9    Qurishi?

10        A.   Yes.

11        Q.   And so I'm understanding you, before you saw

12   the struggle with the firearm, you observed Mr. Yuriar

13   punch Officer Qurishi multiple times in the head and face

14   area, his head bounce off the concrete, actually heard it

15   bounce off the concrete; is that correct?

16        A.   Yes.

17        Q.   Would you consider what you observed

18   Mr. Yuriar doing to the officer a violent assault against

19   the police officer?

20        A.   Yes.

21        Q.   You had testified earlier that you heard some

22   profanities that Mr. Yuriar was saying.

23             Do you recall that?

24        A.   Yes.

25        Q.   Was that something that you observed on scene

1    or heard on scene?

2           A.    Yes.

3           Q.    Okay.  Because you testified that the only

4    words that you heard Mr. Yuriar say on scene was, "You

5    like that."  So I just want a clarification.

6                 So what profanities did you hear on scene?

7           A.    I don't recall what exact profanities I heard

8    on scene.  I just recall that I heard "You like that."

9           Q.    But you did hear profanities as well while you

10   were on scene; is that correct?

11          A.    Yes.

12          Q.    You just don't recall the specific

13   profanities?

14          A.    No.

15          Q.    Is my statement correct?

16          A.    Yes, it's correct.

17          Q.    Okay.  Did you consider what Mr. Yuriar was

18   saying to Officer Qurishi, "You like that" and the

19   profanities to be a threat?

20          A.    Yes.

21          Q.    Why is that?

22          A.    Just based on the active assault, the

23   suspect's position on the mount on top of Officer

24   Qurishi.

25          Q.    The profanities and "You like that," is that

 1   something you heard before you observed the struggle with

 2   the firearm?

 3        A.   Yes.

 4        Q.   Did you at any point observe Officer Qurishi

 5   trying to physically get Mr. Yuriar off him?

 6        A.   It appeared to me Officer Qurishi was trying

 7   to escape any way he could.

 8        Q.   Was Officer Qurishi able to escape?

 9        A.   No.

10        Q.   Did Officer Qurishi appear to be exhausted at

11   the time that he's receiving repeated blows to his face,

12   head, neck area?

13        A.   Yes.

14        MS. SULLIVAN:  Mr. Galipo, I don't know if

15   you're objecting, but you're on mute.

16        MR. GALIPO:  Oh, thanks.  I'm objecting that

17   it assumes facts not in evidence.  Calls for speculation.

18   Lacks foundation.  Sorry about the mute.

19        MS. SULLIVAN:  Sure.  I wasn't sure if you

20   were talking to someone in your office or making

21   objections.

22        MR. GALIPO:  Sometimes I'm not even sure what

23   I'm doing.

24        MS. SULLIVAN:  Okay.

25        Q.   Were you aware of the extent of Officer

1    Qurishi's injuries when you were observing Mr. Yuriar

2    deliver violent blows to the officer's face and head?

3            MR. GALIPO:  Objection.  Calls for

4    speculation, lacks foundation, and assumes facts not in

5    evidence.

6            MR. THOMAS:  You can answer.

7            THE WITNESS:  Oh, sorry.

8            MR. THOMAS:  Calls for speculation.  You can

9    answer.

10           THE WITNESS:  At the time, no.  I did not know

11   the extent of injuries.

12   BY MS. SULLIVAN:

13       Q.   At the time that you were observing Mr. Yuriar

14   deliver violent blows to Officer Qurishi's face and head,

15   did you have any concern that Officer Qurishi was going

16   to be knocked out or lose consciousness?

17       A.   Yes.

18       Q.   And why is that?

19           MR. THOMAS:  Objection.  Asked and answered,

20   but you can answer again.

21           THE WITNESS:  Just based on his head bouncing

22   off the concrete, the representative blows to his head

23   and face, and I wasn't sure at the time how long he had

24   been fighting and struggling for, but because -- based on

25   his level of exhaustion, I would assume for a long period

1   of time they were fighting.  So, yes.

2   BY MS. SULLIVAN:

3       Q.   At this point in time when you're observing

4   Officer Qurishi, would you see his face?

5       A.   Yes.

6       Q.   Do you recall what his expression was?

7            MR. THOMAS:  Objection.  Vague.

8            You can answer.

9            THE WITNESS:  Scared.  Exhausted.

10  BY MS. SULLIVAN:

11      Q.   Did he appear to be terrified?

12           MR. GALIPO:  Objection.  Leading.  Calls for

13  speculation.

14           MR. THOMAS:  You can answer.

15           THE WITNESS:  Yes.

16  BY MS. SULLIVAN:

17      Q.   So you testified about the struggle with the

18  firearm, but I just want to make sure I understand.

19           So at some point you saw Officer Qurishi with

20  a gun in his right hand; is that correct?

21      A.   Yes.

22      Q.   When Officer Qurishi had the gun in his right

23  hand, was Mr. Yuriar's hand on the gun at the same time?

24      A.   Yes.

25      Q.   Was there ever a time, while you're observing

 1   what is unfolding on scene, that you saw Officer --

 2   Officer Qurishi's hand just on the gun and not -- I'm

 3   going to start this question over.  So strike that.

 4            When you were on scene watching the incident

 5   unfold, was there ever a point in time where you saw just

 6   Officer Qurishi's hand on the gun?

 7        A.   No.

 8        Q.   Was there ever a time while you were on scene

 9   that you saw just Mr. Yuriar's hand on the gun?

10        A.   No.

11        Q.   After Mr. Yuriar was shot and Officer Qurishi

12   got up, did you observe any physical injuries to Officer

13   Qurishi?

14        A.   Yes.

15        Q.   Did you observe a bruise on his forehead?

16            MR. GALIPO:  Objection.  Leading.

17   BY MS. SULLIVAN:

18        Q.   Tell me what injuries you observed to Officer

19   Qurishi.

20        A.   At the time I saw a bruise to his forehead;

21   his eyes looked a bit shaky, to me, just from experience;

22   possible loss of consciousness or some sort of head

23   injury.

24        Q.   Did you observe any bleeding on any areas of

25   Officer Qurishi's body?

1      I, Laura L. Corning, a Certified Shorthand

2  Reporter of the State of California and a Federal

3  Certified Realtime Reporter, do hereby certify:

4      That the foregoing proceedings were taken

5  before me at the time and place herein set forth;

6      That prior to testifying, the witness was

7  placed under oath by me;

8      That a verbatim record of the proceedings was

9  made by me using machine shorthand and thereafter

10  transcribed under my direction and supervision;

11      That the foregoing deposition is a full, true,

12  and correct transcript of my shorthand notes so taken and

13  transcribed;

14      That any dismantling of this transcript will

15  void my certification as a Certified Shorthand Reporter,

16  Federal Certified Realtime Reporter;

17      That I am not financially interested in the

18  action, nor a relative or employee of any attorney or any

19  of the parties, nor am I in any way interested in the

20  outcome of the pending litigation.

21      IN WITNESS WHEREOF, I have this date subscribed

22  my name.

23  Dated:  7/19/25

24  _____

LAURA L. CORNING

25  FCRR, CSR No. 8363