# EXHIBIT C

1     UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3

4 MARIA LIN YURIAR; and JUAN  )
  GUILLERMO,         )
5             )
     Plaintiffs,   )
6            ) Case No.:
   vs.        ) 4:23-cv-06438-KAW
7            )
  STATE OF CALIFORNIA; BASIR  )
8 QURISHI; and DOES 3-10,   )
  Inclusive,       )
9            )
     Defendants.   )
10 _____)

11

12

13

14

15   VIDEOTAPED/VIDEOCONFERENCED DEPOSITION OF

16      BASIR SAHIL QURISHI

17       Dublin, California

18      Friday, July 11, 2025

19

20

21

22

23 Reported by:
  LAURA L. CORNING
24 FCRR
  California CSR No. 8363
25 JOB No. 18224

Basir Sahil Qurishi

1    BY MR. GALIPO:

2        Q.    And did either one of them respond?

3        A.    I recall the suspect on the sidewalk respond

4    and tell me he had a knife in his waistband area.

5        Q.    Was that Suspect A?

6        A.    Yeah.  That's Suspect A, the one that was on

7    the sidewalk.

8        Q.    And did he take the knife out at some point?

9        A.    No.

10        Q.    He just --

11        A.    But I don't -- I don't know if he did at some

12    point throughout the whole thing, but while I was near

13    him, he did not.

14        Q.    He just told you he had a knife in his

15    waistband in response to your question.

16        A.    Yes.

17        Q.    Did Suspect B respond at all to your question

18    about whether they had weapons?

19        A.    No.

20        Q.    At that point did you try to communicate to

21    find out where your partner was?

22        A.    No.

23        Q.    At that point did you try to find out where

24    backup was and how far out it was?

25        A.    At that exact point, no.

Basir Sahil Qurishi

1    Q.   Did you consider holding these two at gunpoint

2    until your backup arrived?

3         MS. SULLIVAN:   Incomplete hypothetical.  Lacks

4    foundation, but go ahead to the extent you understand.

5         THE WITNESS:   I felt like I had to make a move

6    due to the fact it felt like a long time was passing and

7    I had two suspects in front of me.

8    BY MR. GALIPO:

9    Q.   I -- I get that part.  I guess what I'm asking

10   you is whether you considered waiting for backup; whether

11   the thought even crossed your mind.

12   A.   So I already felt like I was [sic] waited and

13   waiting long enough, and that's when I decided to make my

14   decision to ...

15   Q.   Okay.  To take some action or to make contact

16   with them?

17   A.   Yes.  The goal was to place them in handcuffs.

18   Q.   So when you say you thought you waited long

19   enough, you mean you had waited long enough for backup to

20   get there?

21   A.   It just felt like a lot of time was passing

22   by.  I was getting worried that these two would end up

23   doing something.  So I felt like I needed to start

24   placing cuffs on these suspects.

25   Q.   Did you have any information as to how far

Basir Sahil Qurishi

```
 1   out -- backup was out?

 2         A.   I -- I don't know.

 3         Q.   What did you do to try to place handcuffs on

 4   them?

 5         A.   I gave them the command to prone out on the

 6   ground.

 7         Q.   Anything else?

 8         A.   I remember walking up towards Suspect A and

 9   grabbing his wrists and attempting to place cuffs on him.

10         Q.   And what happened with Suspect A?

11         A.   I was able to get a handcuff on his wrist.

12         Q.   One wrist?

13         A.   Yes.

14         Q.   Do you recall which wrist it was?

15         A.   I believe it was his right wrist.  I'm not

16   entirely sure.  It's been -- been a while.

17         Q.   Was Suspect A still standing on the sidewalk

18   when you approached him?

19         A.   So I -- like I said, I had them all -- I had

20   both suspects, A and B, prone on the ground.  So he was

21   prone when I approached him.

22         Q.   So when you asked them to prone on the ground,

23   they both got down prone in compliance with your command?

24         A.   Suspect A got down prone.  Suspect B went

25   prone but started being fidgety and reaching for his
```

Basir Sahil Qurishi

1    ankle area.

2           Q.    While he was prone?

3           A.    Yes, while he was prone.

4           Q.    And if I'm understanding, when you say

5    "prone," you're talking about chest/stomach down?

6           A.    Yes.  Prone as in chest and belly on the

7    ground.

8           Q.    And when Suspects A and B were prone, how far

9    were they apart from each other approximately?

10          A.    Again, I don't know the exact distance that

11   they were from each other.  If you want me to give you an

12   estimate, like I said, it felt like Suspect A was 10, 15

13   feet and Suspect B was 20, 25 feet from me.

14          Q.    That would -- so those are the estimates you

15   gave initially, but they were about the same when they

16   went prone?

17          A.    I believe so.  I -- I don't know.

18          Q.    And when Suspect B was reaching towards his

19   ankle area, did you see any weapon or anything in that

20   area?

21          A.    I -- I don't know if he had anything concealed

22   within that area.

23          Q.    But did you see any gun at that time?

24          A.    I wouldn't know if it was concealed within

25   that area or not.  If you're talking about on the outside

Basir Sahil Qurishi

1      A.    I believe he -- by the time I caught up to

2  him, we may be where -- from his position of being prone,

3  we were probably -- this is just me guessing -- 15 feet

4  from that original position.

5      Q.    And when you caught up to him, what were you

6  standing on, if you recall?  Was it grass?  Concrete?

7  Dirt?  Or something else?

8      A.    I do not recall.  I just remember it felt

9  uneven.  It did not feel solid.

10     Q.    Did you say anything to him after he got up

11 and started running away?

12     A.    I do not recall anything specifically.  I -- I

13 may have told him to get on the ground or stop.  I don't

14 recall.

15     Q.    Did he say anything to you as he was moving

16 away from you?

17     A.    I don't know if he did or not.

18     Q.    What did you do once you caught up to him?

19     A.    I just remember wrapping my arms around him.

20     Q.    And why -- why were you doing that?

21     A.    To get him on the ground or to get him to stop

22 running.

23     Q.    Did you eventually get him back on the ground?

24     A.    Yes.  I remember he was also himself -- like,

25 it felt like his body weight was going down towards the

1  ground himself as I also was trying to push him towards

2  the ground.

3      Q.   And do you believe you may have asked him to

4  get on the ground again?

5      A.   I don't remember for sure, but I may have told

6  him to get on the ground.

7      Q.   And so was this the second time now he's on

8  the ground prone?

9      A.   I don't know if he was prone in this moment,

10 but he was on the ground with his general chest area

11 facing towards the ground.

12     Q.   Was he saying anything to you at this point?

13     A.   I do not recall.

14     Q.   Did you attempt to handcuff him at this point?

15     A.   So at this moment, like I said, the ground

16 where I was, it felt uneven, and with the Suspect A still

17 on the sidewalk proned out, I felt like I needed to

18 reposition myself and Suspect B.

19     Q.   So did you attempt to handcuff him at all when

20 he went down the second time?

21     A.   I don't believe I did.

22     Q.   And the reason is -- is because of the uneven

23 ground and the positioning of Suspect A?

24     A.   I just remember my thought process being to

25 reposition me and Suspect B due to it not feeling even or

Basir Sahil Qurishi

1    solid.

2          Q.    And did you reposition Suspect B?

3          A.    As I tried to reposition Suspect B, that's

4    when he immediately turned and grabbed both of my legs

5    and threw me on the ground and got on top of me, told me

6    he was going to kill me, and started delivering deadly

7    blows to my head over and over again.

8          Q.    We're going to get to all that.  I'm just

9    trying to take it one step at a time.

10          I -- I think I asked you when you attempted to

11   reposition him.

12          A.    (Indiscernible.)

13          MS. SULLIVAN:  Asked and answered.  Asked and

14   answered.

15          Go ahead.

16          THE WITNESS:  So, yes, as I tried to

17   reposition him, that's when he took me down on the ground

18   did everything I just explained to you.

19   BY MR. GALIPO:

20          Q.    Okay.  So you- -- you're saying that you --

21   you had him down in a prone or semi-prone position the

22   second time, and you didn't try to handcuff him at that

23   point?  Am I understanding you correctly?

24          MS. SULLIVAN:  Misstates testimony and lacks

25   foundation.

Basir Sahil Qurishi

1          Go ahead.

2          THE WITNESS:  So at that point, like I said,

3    it felt like the ground was uneven, and I wasn't sure why

4    it felt that way to me, but I felt like my best thing was

5    to reposition myself and Suspect B.

6    BY MR. GALIPO:

7        Q.    Okay.  So I'm just going to break this down.

8          Would you agree you did not try to handcuff

9    him at that point?

10         MS. SULLIVAN:  Same objection.  Asked and

11   answered twice now, but go ahead.

12         THE WITNESS:  So, again, at that point I was

13   choosing to reposition myself and Suspect B due to

14   everything I explained.

15   BY MR. GALIPO:

16       Q.    I know you choose [sic] to reposition.  I'm

17   just wondering if you tried to handcuff him before you --

18   you reposition or decided not to for the reasons you

19   stated?

20       A.    Okay.  If -- sorry.  I misunderstood your

21   question.  No, I didn't try to because my goal was to

22   reposition.

23       Q.    Okay.  So my next question is, what was your

24   plan where you wanted to reposition him to?

25       A.    I felt like repositioning him towards a

Basir Sahil Qurishi

1  feet at some point?

2      A.   I don't know.  I don't know how or what he

3  did.

4      Q.   How were you planning on getting him from

5  where he was to the sidewalk?

6      A.   I was planning on assisting him up and walking

7  over there.

8      Q.   Okay.  How far was the sidewalk from you?

9      A.   I don't know.  If I were to give a guess, 10,

10  15 feet.

11      Q.   That's an estimate?

12      A.   That is my estimate.

13      Q.   Okay.  So you were going to stand him up, walk

14  him over to the sidewalk, and -- and put him back down

15  prone?  Is that what you were thinking?

16      A.   I was going to put him in a better position to

17  where I could place him in cuffs and have him wait.

18      Q.   And you felt you could not put him in cuffs in

19  the position he was in?

20      A.   So in that position I felt like it was just an

21  uneven surface.  It didn't feel, in that moment, right

22  for me, and I just wanted to reposition myself and

23  Suspect B.

24      Q.   And had you started the process of -- of

25  getting him up?

Basir Sahil Qurishi

1   but are you saying that he got up from that second prone

2   position at some point?

3       A.    What I'm saying is -- I'm saying I'm not sure

4   if I was helping assisting him get up or if he was

5   getting up on his own.  I did not expect him to do what

6   he did.  I didn't expect him to quickly turn around and

7   throw me on the ground and continue to strike me with

8   deadly blows and tell me he's going to kill me and all of

9   that.

10      Q.    Okay.

11      A.    I didn't expect any of that.

12      Q.    I understand.  So you're saying he got up.

13  You're just not sure if you assisted him up or not?

14      A.    Yes.  I don't recall how it happened.

15      Q.    And you're saying that it was after he got up

16  that he attacked you?

17      A.    Yes.  I'm saying it was -- it was at that

18  moment, during that repositioning that I was trying to

19  do, whether he was getting up on his own or whether it

20  was me who was assisting him get up, it was at that

21  moment he swept me from under my feet, got on top of me

22  and started striking me with deadly blows to my head and

23  telling me that he's going to kill me.

24      Q.    Okay.  So he takes you to the ground, and at

25  some point you end up on your back; is that correct?

1      A.    Yes.    That sounds accurate.    He -- like I

2    said, he grabbed both of my legs, and it felt like I fell

3    straight on my back.

4      Q.    And he was on top of you at some point?

5      A.    Yeah.    It felt like -- immediately after he

6    threw me down, it felt like he was immediately on top of

7    me.

8      Q.    And at some point he starts punching?

9      A.    Yes.    Everything felt immediate one after the

10   other.

11     Q.    Could you tell if he was punching you with his

12   right hand or left hand?

13     A.    When he was giving me those deadly blows to

14   the head, it felt like he was using both hands.

15     Q.    Okay.    Was he wearing gloves at the time?

16     A.    I do not recall if he was wearing gloves at

17   the time.

18          MS. SULLIVAN:    Hey, Dale, in the next five or

19   ten minutes do you want to take a break?

20          MR. GALIPO:    Yeah.    We can take a break.    One

21   second, please.

22     Q.    During the incident, did you have any audio

23   recording device on?

24     A.    Yes.

25     Q.    And where was that on your person?    Was

Basir Sahil Qurishi

```
 1          A.    So I was told by, I believe, a doctor that my
 2   left orbital bone was fractured.  I was never diagnosed,
 3   but that's what I was told.
 4          Q.    Did you need any stitches, if you know?
 5          A.    I don't believe I needed stitches.
 6          Q.    Were you bleeding from anywhere immediately
 7   after the incident?
 8          A.    I don't recall if I was bleeding.
 9          Q.    Did you have any laceration, to your
10   knowledge, in the back of your head?
11          A.    No.  I don't believe I had a laceration to the
12   back of my head.
13          Q.    Do you recall in your statement saying that
14   you ran after Suspect B and got him on the ground?
15          A.    I -- I don't recall the statement that
16   clearly, but I may have said something to that extent.
17          Q.    Okay.  Did you run after him and try to get
18   him on the ground?
19          A.    Yes.  I -- I did.
20          Q.    And do you recall saying in your statement
21   that you tried to get Suspect B up, and as you were
22   getting him up, that's when he turns around and gets out
23   of your grip?
24          MS. SULLIVAN:  Can you refer me to the page
25   you're talking about, Mr. Galipo?
```

 1              MR. GALIPO:  Sure.  Sure.  So it's Page 34,

 2    Bates-stamped 576, and it's Lines 13 through 15.

 3              MS. SULLIVAN:  Give me a second.

 4              MR. GALIPO:  Sure.

 5              MS. SULLIVAN:  Sorry.  And, Basir, do you have

 6    your interview handy?

 7              THE WITNESS:  I could pull it up on my phone

 8    here, but I don't have access to my work email on this

 9    laptop.  I only have access on my phone.

10              MS. SULLIVAN:  Okay.  All right.  Let's see

11    how the questions go, and if you need to reference it, we

12    can either share it with you or have you pull it up.

13              You said, Mr. Galipo, Page 34, lines what?

14              MR. GALIPO:  I was referring to Lines 13

15    through 15 where he says he tried to get Suspect B up --

16    I'm paraphrasing -- and as I'm getting him up, he quickly

17    turns around and gets out of my grip.

18              MS. SULLIVAN:  Okay.

19    BY MR. GALIPO:

20         Q.   Do you recall saying that or words to that

21    effect in your statement?

22         A.   I don't recall, but if that's what it says,

23    then, yeah, I -- I said that.

24         Q.   And did that occur, that you were trying to

25    get him up, and he turned around and got out of your

Basir Sahil Qurishi

1  grip?

2       A.   Yes.  That's essentially what could have

3  occurred.  Whether -- like I said, whether he was trying

4  to get up on his own or whether I was, I couldn't

5  remember.

6       Q.   Now, you holstered your weapon after pulling

7  it out initially; is that right?  In other words, when

8  you pulled it out and then had him go prone and you were

9  going to handcuff them, starting with Suspect A, you

10  holstered your weapon at that point; is that correct?

11       A.   As I went to go handcuff Suspect A, yes, I

12  re-holstered my weapon.

13       Q.   And did you have the retention -- was there a

14  retention on that holster?

15       A.   Yes.  That holster has a retention.

16       Q.   Do you recall what type of holster it was?

17  Was it a Safariland holster or do you remember?

18       A.   To my knowledge, it should have been a

19  Safariland holster.

20       Q.   And do you recall how many locking mechanisms

21  it had on it?

22       A.   I don't recall the exact number of locking

23  mechanisms it had on it.  It had a retention that was

24  foldable from the top area.  I don't know how to quite

25  describe it to you.

```
1        Q.    Okay.  But you -- when you re-holstered your

2   weapon, you would have had the retention down?

3        A.    When I re-holstered my weapon, I put the

4   retention back up.  If I were --

5        Q.    Why did you put it back up?

6        A.    It's just, one, muscle memory, and it's more

7   safe when the retention is locked.

8        Q.    And you had training on gun retention,

9   correct?

10       A.    Did I have training on gun retention?

11       Q.    Yes.  Essentially, things you can do to keep

12  other people from getting your firearm.

13       A.    Yes.

14       Q.    And what was some of your training on gun

15  retention, if you recall?  What can you do to keep people

16  from being able to grab your firearm?

17            MS. SULLIVAN:  Vague as to time.  Before or

18  after the incident or both?

19            MR. GALIPO:  We can break it down.

20       Q.    Let's start with before the incident first.

21  So at the academy and your training for, I guess,

22  approximately a year or so before the incident?

23       A.    I wouldn't be able to tell all of the

24  techniques I had learned in the academy, but they did

25  teach us techniques on how to break away someone's grip
```

Basir Sahil Qurishi

1   if they're reaching or things of that nature.

2        Q.   Were you also trained not to put your firearm

3   in a position where it can be grabbed, if possible?

4        A.   I'm unsure what you're asking exactly.

5        Q.   Like, for example, if you're on the side of a

6   car, not to put your firearm inside the car where it

7   could be grabbed, if you can avoid that?

8        A.   I don't know if we were necessarily trained,

9   but it's -- yeah, we would not just leave our firearm

10  unattended.  It's always supposed to be on us, on [sic]

11  your holster.  The only time it's unattended is, if we're

12  going to the jail or something, we put it in the trunk,

13  and we lock the trunk, but that's it.

14       Q.   And other than what you've told me so far, do

15  you recall any other training you had on gun retention

16  before this shooting incident?

17       A.   I don't recall having more training other than

18  from the academy regarding gun retention.

19       Q.   How about since the incident?  Have you had

20  different or additional training on gun retention?

21       A.   Regarding gun retention, I'm not entirely

22  sure.  We do have quarterly trainings that go through

23  everything we've learned.

24       Q.   I'm just wondering if you recall having any

25  training since the incident on gun retention?

1  striking me with blows to the head and telling me he's

2  going to kill me.  At that moment I felt like I had to

3  fight for my life, and I utilized my firearm.

4       Q.   So were you on your back when you took your

5  firearm out?

6       A.   Yes.  When I took my firearm out, I was on my

7  back while Suspect B was delivering these deadly blows to

8  my head.

9       Q.   And how did you get your firearm out?  Did

10  you -- did you do that with one hand or two?

11       A.   I remember using just my right hand.

12       Q.   And what did you have to do with respect to

13  the locking mechanism to get the firearm out?

14       A.   In respect to the retention, I just remember

15  using my right thumb, pushing it down and forward, which

16  enables me to remove the firearm.

17       Q.   And had you already planned on shooting him

18  before you removed the firearm?

19       A.   So, like I mentioned, at this moment, during

20  that time, Suspect B was on top of me.  He told me he was

21  going to kill me, and he was doing so by delivering

22  deadly blows to my head.  So in that moment, I removed my

23  firearm in order to stop the threat and to save my life

24  from being taken from me.

25       Q.   So if I'm understanding your answer, you were

Basir Sahil Qurishi

1    intending to shoot him before you removed the -- removed

2    the firearm.  That's why you removed it.  Am I getting

3    that correct?

4              MS. SULLIVAN:  Asked and answered, but go

5    ahead.

6              THE WITNESS:  The reason why I was removing

7    the firearm was to stop the deadly threat that Suspect B

8    was doing by telling me he was going to kill me and also

9    by showing it by delivering deadly blows to my head.

10             So, yes, I removed the firearm at that point

11   with the idea to stop the threat and to shoot Suspect B.

12   BY MR. GALIPO:

13        Q.   Okay.  And how much time do you think passed

14   between you removing the firearm and you shooting him?

15        A.   I -- I do not know.  Everything felt very,

16   very long.

17        Q.   Well, how long was it?  Can you give me any

18   estimate or range?

19             MS. SULLIVAN:  Asked and answered, but go

20   ahead.

21             THE WITNESS:  Again, I do not know.  That

22   whole situation felt very long.

23   BY MR. GALIPO:

24        Q.   Right now I'm just asking for how much time

25   between you taking the gun out and shooting him.

```
 1              MS. SULLIVAN:  Asked and answered.

 2              Go ahead.

 3              THE WITNESS:  Again, I do not know.  It

 4   felt -- the whole thing felt long, even during that

 5   process of what you're asking.

 6   BY MR. GALIPO:

 7       Q.   I get that.  But when you say it "felt long,"

 8   I don't know if you're saying it felt like 30 seconds, 10

 9   seconds, five seconds?  I'm trying to get some range

10   because I don't know what it "felt long" means in terms

11   of seconds, in your mind.

12       A.   For that particular moment, it maybe felt like

13   a minute, 30 seconds.  It felt very long to me in that

14   particular moment as he was on top of me delivering these

15   deadly blows to my head.  It felt very long.

16       Q.   Okay.  Maybe my question wasn't very clear.

17              I'm not asking for the entire event right now.

18   I'm just asking for an estimate of time from you pulling

19   out your gun to shooting him.  That's what I'm trying to

20   focus in on.  Do you understand what I'm asking?

21              MS. SULLIVAN:  And he -- he answered that

22   question multiple times, and he said he --

23              MR. GALIPO:  He said it felt like a long time.

24   I just don't know what's long to him.

25              MS. SULLIVAN:  And he said a minute or 30
```

1    seconds.

2            MR. GALIPO:  Oh, but then he said that was the

3    whole incident.  Let me clarify.

4        Q.    So are you saying it seemed like 30 seconds to

5    a minute between pulling out your firearm and shooting?

6        A.    For that particular moment, yes, it felt long,

7    around that range.  The whole incident itself, I was not

8    saying that was 30 seconds or a minute.

9        Q.    Oh, okay.

10       A.    I felt it was a very long incident.

11       Q.    Okay.  And during this 30 seconds or a minute

12   that you're estimating between pulling out your firearm

13   and shooting, did you give him a verbal warning you were

14   going to shoot him if he did not stop?

15           MS. SULLIVAN:  It misstates testimony.  He

16   said in the moment that's what it felt like, but go

17   ahead.

18           THE WITNESS:  So, yes, in the moment, it felt

19   like it was that long.  I don't know how long it really

20   was, which is why I kept telling you I don't know how

21   long it was.

22           As far as giving a verbal command, due to the

23   totality of the circumstances and everything that was

24   going on with him on top of me telling me that he's going

25   to kill me and repeatedly striking me in the head with

1  deadly blows, even while I was taking out my firearm, I

2  felt like I had no time or was unable to even give a

3  verbal command.

4  BY MR. GALIPO:

5      Q.   Did you say anything to him after you pulled

6  your firearm out?

7      A.   I don't know.  I don't recall if I ever said

8  anything.  I don't believe I did.

9      Q.   Did you say anything to him during this

10  struggle, even before you pulled your firearm out?

11     A.   I do not know if I said anything.  I don't

12  remember saying anything.  I just remember him repeatedly

13  hitting me in the head with these deadly blows over and

14  over again.

15          MR. GALIPO:  Hold on a second.  What happened

16  to Kimberly?

17          MS. KELLY:  Kimberly is having technical

18  difficulties.  Let me see if she can log back on.

19          MR. GALIPO:  Certainly.  Let's go off the

20  record and see if she can come back on.

21          THE VIDEOGRAPHER:  We're off the record

22  at 2:38 p.m.

23              (Brief interruption.)

24          THE VIDEOGRAPHER:  We are back on the record

25  at 2:41 p.m.

Basir Sahil Qurishi

```
1   BY MR. GALIPO:
2        Q.   When you took your firearm out of your holster
3   with your right hand, what -- where did you direct it or
4   point it?
5        A.   So I remember pointing it up, and then I
6   started moving it towards the left where I believed his
7   general vicinity was.  But during that time, as I was
8   moving it, it felt like there was some sort of
9   resistance.  I was unsure if he was grabbing it or not.
10       Q.   Well, let me ask you this:  Did you ever see
11  his hand on your weapon at any point?
12       A.   I couldn't see anything due to the fact he
13  just kept hitting me in the head over and over again with
14  deadly blows.
15       Q.   So I take it that's no, you did not see his
16  hand on your weapon because you're saying you couldn't
17  see anything?
18       A.   No.  I -- I couldn't see if he had his hand on
19  my weapon or not.  He just continued to strike me in the
20  head with deadly blows over and over again.
21       Q.   How many times do you think he struck you in
22  the head after you pulled your gun out?
23       A.   After I pulled my gun out, I do not know.  It
24  felt like multiple times throughout the incident.  After,
25  it felt like he struck me multiple times as well.  I do
```

Basir Sahil Qurishi

```
 1        A.   Again, I don't know.  It felt like he was
 2   using both of his hands when he was delivering these
 3   deadly blows to my head.
 4        Q.   Could you ever feel his hand on your hand at
 5   any time?
 6        A.   I don't believe I ever felt his hand on my
 7   hand.  I just felt, like I said, some sort of resistance
 8   as I was trying to position my firearm towards him.  I
 9   don't know if he was grabbing it or not.  I assumed he
10   may have been just because it was a resistance as I was
11   trying to aim it towards his general area to which I
12   thought he was in.
13        Q.   And were you trying to strike him when you
14   fired your shot?
15        A.   The goal was to prevent the threat from
16   continuing.  So, yes, I was trying to position my firearm
17   to where it would strike the threat; in this case, that
18   would be Suspect B who was on top of me telling me he was
19   going to kill me and delivering deadly blows.
20        Q.   Yes.  I've heard that a few times during the
21   deposition.
22        A.   Yeah.
23        Q.   So were you trying to aim at his upper body?
24        A.   I was just trying to stop the threat.  I
25   didn't know where I was aiming it.  I was just going
```

Basir Sahil Qurishi

1   towards that general vicinity of where I thought he was

2   in.

3        Q.   Was the barrel of your gun pressed against any

4   part of his body when you fired?

5        A.   Again, I do not know.  All I can say, I felt

6   resistance.  I don't know if that was him grabbing it.  I

7   don't know what it was.  But it felt like there was

8   resistance as I was moving it to the left towards his

9   general area.

10       Q.   Well, do you know if the resistance was caused

11  by the barrel of your gun impacting a part of his body

12  before you fired?

13       A.   Again, I don't know what it was caused by.

14  During this whole time, he was just over and over again

15  hitting me in the head with deadly blows.  I was unable

16  to see anything.  I was just trying to point it towards

17  his general direction; and in this case, I felt there was

18  resistance.

19       Q.   Right.  I was just exploring the resistance

20  you're saying that you felt.

21       A.   Yes.

22       Q.   Do you know if, in your mind, the resistance

23  was consistent with the barrel of your gun impacting a

24  part of his body?

25       A.   Again, I don't know where that resistance was

Basir Sahil Qurishi

 1    gunshots happened.

 2         Q.   Did you ever see anything in the Suspect B's

 3    hands?

 4         A.   I do not know if he was holding anything as he

 5    was striking me in the head with deadly blows, if that's

 6    what you're asking.

 7         Q.   At any time did you ever see anything in his

 8    hands?

 9         A.   I did not see anything in his hands leading up

10    to the point where he was on top of me.  Once he was on

11    top of me and striking me in the head with deadly blows,

12    I do not know because I was unable to see his hands at

13    that moment.

14         Q.   Do you recall initially, when you pulled your

15    firearm out, pointing it at the sky?

16         A.   Yes.  I pulled my firearm out and it was

17    originally pointed upwards towards where the sky would

18    be.

19         Q.   And after the incident, do you recall on your

20    MVARS seeing yourself explaining what had happened?

21         A.   I'm not sure what you're referring to exactly.

22         Q.   Well, after the incident, are you aware that

23    you're captured on your MVARS video describing in part

24    what happened, leading up right before the shooting?

25         A.   It's been such a long time since I've seen

1   that MVARS footage, I -- I don't know.  I don't recall.

2        Q.   Okay.  Because I'll proffer to you, you never

3   mention anything about your gun or him touching or going

4   for your gun.  Is that something that you believed had

5   occurred while you were still on scene?

6             MS. SULLIVAN:  Object.  Argumentative.  Lacks

7   foundation.  Assumes facts not in evidence.

8             But go ahead.

9             THE WITNESS:  I'm sorry.  I -- I don't

10  understand.  If you could rephrase the question.

11  BY MR. GALIPO:

12       Q.   Sure.  Did you think he was going for your gun

13  while you were still at the scene?

14       A.   I feel like I answered that.  I don't know if

15  he was going for my gun or not.  Like I said, I just felt

16  that resistance.

17       Q.   Okay.  Did you smell any alcohol or drugs on

18  him?

19       A.   No.  I did not smell any alcohol.

20       Q.   And you mentioned at some point that you -- a

21  doctor told you you had a fractured orbital socket?

22       A.   Yes.  I was told that my left orbital area --

23  I was told that it was possibly fractured.

24       Q.   Did you have an MRI scan, if you know?

25       A.   I believe I had an MRI solely for my brain or

Basir Sahil Qurishi

1    skull area.

2         Q.    Do you know if there's any medical record that

3    existed that shows that you had a fractured orbital

4    socket?

5         A.    I don't know as I was never diagnosed for

6    that.  It was just what I was told by the doctor.  They

7    said it's something that heals on its own.

8         Q.    And your training with respect to use of

9    deadly force, are you essentially trained that to use

10   deadly force there has to be an immediate or imminent

11   threat of death or serious bodily injury?

12        A.    Yes.  We are trained in regards to that, to

13   use deadly force when there is an immediate -- imminent

14   threat of great bodily harm or death or injury.  In this

15   case, he was on top of me delivering deadly blows to my

16   head and telling me he was going to kill me, which is why

17   I used deadly force.

18        Q.    Right.  I'm not asking -- I've heard that

19   about 20 times today.  I was trying to focus on your

20   training right now.  And were you trained that if there's

21   not an immediate or imminent threat of death or serious

22   bodily injury you should not shoot?

23        A.    Yes.  If those circumstances aren't available

24   [sic], you should not.

25        Q.    And were you trained that to use deadly force,

1   for there to be an imminent threat of death or serious

2   bodily injury, there has to be the opportunity, ability,

3   and apparent intent to immediately cause death or serious

4   bodily injury?

5        A.   I'm sorry.  Could you repeat that for me?

6        Q.   Sure.  I don't know if you're familiar with

7   there's -- a few years back, I think maybe in the

8   year two-thousand- -- or 2020 or 2021 there was a

9   revision of Penal Code Section 835A in the learning

10  domain.

11            Are you familiar with the training that there

12  has to be the opportunity, ability, and apparent intent

13  to immediately cause death or serious bodily injury to

14  use deadly force?

15       A.   Yes.  And in this case that was happening, in

16  my situation, as Suspect B was telling me he was going to

17  kill me and he was striking me in the head over and over

18  again with deadly blows.

19       Q.   I got that part, I think, over and over again.

20            I was wondering if that was part of your

21  training.

22            MS. SULLIVAN:  Asked and answered.  Go ahead.

23            MR. GALIPO:  He's -- yeah.  I didn't know that

24  he -- I was unclear if he answered yes.  I didn't catch

25  that part.

1      Q.   So I'll ask it again if you want.  Was that

2   part of your training, to use deadly force, the person

3   has to have the ability, opportunity, and apparent intent

4   to immediately cause death or serious bodily injury?

5           MS. SULLIVAN:  Asked and answered.

6           Go ahead.

7           THE WITNESS:  Yes.  We were taught those

8   things in the CHP academy.

9   BY MR. GALIPO:

10     Q.   Okay.  And you also were trained to give a

11  verbal warning before using deadly force when feasible?

12     A.   When feasible, yes.  In my situation, it was

13  not feasible as, again, Suspect B was on top of me and

14  actively engaging in throwing these deadly blows towards

15  my head and telling me he was going to kill me.

16     Q.   I think -- I thought you told me he just said

17  that one time?

18     A.   Yes.  He's telling me he's going to kill me.

19  I heard it one time.

20     Q.   Okay.  And, if you know, does the policy say

21  you should give a verbal warning when possible?

22     A.   I am not sure what the policy says verbatim,

23  but when possible and if feasible, yes, a warning could

24  work.

25     Q.   Okay.  And, obviously, you're aware, based on

 1   your training, that shooting someone is likely to cause

 2   death or serious bodily injury?

 3        A.    Yes, I'm aware that shooting someone could

 4   cause great bodily injury or death.

 5              MR. GALIPO:  Okay.  Thank you.

 6              Kimberly, that's all the questions I have.

 7              MS. SULLIVAN:  I don't have anything, so we

 8   can close out the deposition.  I'm going to take --

 9              MR. GALIPO:  I'm sorry.

10              MS. SULLIVAN:  I'll take an electronic copy

11   and the video synced, please.

12              MR. GALIPO:  Okay.  We're going to go per

13   Code.

14              And I assume, Laura, you'll follow up on how

15   they want their copies, but I think Kimberly just told

16   you.

17              And then, I think, Karen, we can go off the

18   record now.

19              THE VIDEOGRAPHER:  All right.  We're off the

20   record at 3:31 p.m.

21              (Whereupon at 3:31 p.m. the deposition of

22        Basir Sahil Qurishi was concluded.)

23

24

25

1    I, Laura L. Corning, a Certified Shorthand

2  Reporter of the State of California and a Federal

3  Certified Realtime Reporter, do hereby certify:

4        That the foregoing proceedings were taken

5  before me at the time and place herein set forth;

6        That prior to testifying, the witness was

7  placed under oath by me;

8        That a verbatim record of the proceedings was

9  made by me using machine shorthand and thereafter

10  transcribed under my direction and supervision;

11        That the foregoing deposition is a full, true,

12  and correct transcript of my shorthand notes so taken and

13  transcribed;

14        That any dismantling of this transcript will

15  void my certification as a Certified Shorthand Reporter,

16  Federal Certified Realtime Reporter;

17        That I am not financially interested in the

18  action, nor a relative or employee of any attorney or any

19  of the parties, nor am I in any way interested in the

20  outcome of the pending litigation.

21        IN WITNESS WHEREOF, I have this date subscribed

22  my name.

23  Dated:  7/21/25

24  _____
    LAURA L. CORNING
25  FCRR, CSR No. 8363