1

2

3

4                            UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6

7    MARIA LINA YURIAR, et al.,                    Case No.  23-cv-06438-KAW

8                  Plaintiffs,

9         v.                                       **ORDER GRANTING DEFENDANTS'
                                                   MOTION FOR SUMMARY
10   STATE OF CALIFORNIA, et al.,                  JUDGMENT**

11                 Defendants.                     Re: Dkt. No. 71

12

13        Plaintiffs Maria Lina Yuriar and Juan Guillermo filed the instant case against Defendants

14   County of Alameda, the State of California, Basir Qurishi, and Alexis Perez-Rojas, alleging

15   constitutional and state law violations in connection with the fatal officer-involved shooting of

16   their son, Juan Diego Bernal Yuriar ("Decedent").  (First Amend. Compl. ("FAC") ¶ 2, Dkt. No.

17   30.)  Pending before the Court is Defendants State of California's and Qurishi's motion for

18   summary judgment.[1]  (Defs.' Mot. for Summ. J., Dkt. No. 71.)

19        Having considered the parties' filings, the relevant legal authorities, and the arguments

20   made at the December 18, 2025 hearing, the Court GRANTS Defendants' motion for summary

21   judgment.

22                            I.      BACKGROUND

23        On July 3, 2023, Defendant Qurishi and Officer Ryan Hardin were on patrol in a fully

24   marked California Highway Patrol ("CHP") vehicle when they observed a Hyundai speed past at

25   98 MPH in a 65 MPH zone.  (Hardin Decl. ¶¶ 3-6, Dkt. No. 71-2.)  Officer Hardin accelerated to

26   catch up to the Hyundai, which exited the freeway and crashed into an electrical box at the end of

27   _____

28   [1] The claims against Defendants County of Alameda and Perez-Rojas were dismissed with
     prejudice pursuant to stipulation.  (Dkt. Nos. 59, 60.)

1    the off-ramp.  (Hardin Decl. ¶ 7-8; Roistacher Decl., Exh. 1 ("CHP Vehicle Footage") at 0:44-

2    0:59, Dkt. No. 71-3; Valenzuela Exh., Dkt. No. B ("Pls.' Qurishi Interview") at 31:11-17.)  At

3    least three individuals wearing ski masks exited the Hyundai and fled into a residential

4    neighborhood.  (Hardin Decl. ¶¶ 10-11; Roistacher Decl., Exh. 19 (Defs.' Qurishi Depo. at 16:4-6,

5    16:9-11).  Defendant Qurishi did not see that any individual had weapons as they fled.  (Pls.'

6    Qurishi Interview at 50:20-24.)

7         Officer Hardin repeatedly told the individuals to stop running.  (Hardin Decl. ¶ 12.)  As

8    Officer Hardin pursued one individual, he instructed Defendant Qurishi to follow him in the patrol

9    vehicle.  (Hardin Decl. ¶ 15.)  Defendant Qurishi returned to the patrol vehicle and drove in the

10   direction he believed Officer Hardin and one of the suspects had run.  (Defs.' Qurishi Depo. at

11   17:6-10.)  Defendant Qurishi saw two figures running who he assumed was Officer Hardin and a

12   suspect, but upon getting closer realized both individuals had ski masks on.  (Defs.' Qurishi Depo.

13   at 17:17-22.)  The individuals were Ivan Ramirez and Decedent.

14        Defendant Qurishi unholstered his gun and exited the patrol vehicle, commanding that

15   Ramirez and Decedent get on the ground.  (CHP Vehicle Footage at 1:55-2:05.)  Both complied.

16   (*See* Roistacher Decl., Exh. 2 ("Security Camera 1") at 8:38-49.)  Defendant Qurishi reported that

17   he had two individuals detained and gave his location.  (CHP Patrol Footage at 2:18-38.)  While

18   waiting for backup, Defendant Qurishi observed Decedent acting "fidgety" and reaching for his

19   ankle area.  (Defs' Qurishi Depo. at 22:1-3, 26:22-27:5.)  A witness, Owen Vivo, also saw

20   Decedent reaching near his ankle or shoe area.  (Roistacher Decl., Exh. 22 ("Defs.' Vivo Depo.")

21   at 41:13-17.)  Defendant Qurishi did not see a weapon, but based on his action thought a weapon

22   could be concealed there.  (Pl.'s Qurishi Interview at 62:3-10, 85:7-13.)

23        After feeling like he had waited an extended period of time for backup to arrive, Defendant

24   Qurishi decided to handcuff the suspects because there were two suspects and he was worried they

25   would "do[] something."  (Defs.' Qurishi Depo. at 25:5-24.)  Defendant Qurishi holstered his gun

26   and approached Ramirez.  (Defs.' Qurishi Depo. at 26:8-9.)  Decedent was fidgeting, occasionally

27   lifting his legs and reaching for his ankle.  (Security Camera 1 at 9:30-11:39;  Roistacher Decl.,

28   Exh. 20 ("Defs.' Qurishi Interview") at 61:8-13; Roistacher Decl., Exh. 21 ("Vivo Interview

United States District Court
Northern District of California

2

Video") at 8:14-30.)    Defendant Qurishi ordered Decedent not to move.  (CHP Vehicle Footage at 4:30-31; Vivo Interview Video at 7:49-8:00.)  Defendant Qurishi asked Ramirez and Decedent if they had weapons, but only Ramirez responded, stating he had a knife in his pocket.  (CHP Vehicle Footage at 4:56-5:04; Defs.' Qurishi Depo. at 23:22-24:19.)

While Defendant Qurishi was handcuffing Ramirez, Decedent jumped up and ran.  (CHP Vehicle Footage at 5:05-5:07; Defs.' Qurishi Depo. at 28:4-5.; Vivo Interview Video at 8:50-53.) Defendant Qurishi decided to chase Decedent because Ramirez was compliant, he was unsure if Decedent had a weapon, and he was concerned for the safety of himself and any residents who may have been outside.  (Defs.' Qurishi Depo. at 29:4-13.)  Defendant Qurishi repeatedly ordered Decedent to "get down."  (CHP Vehicle Footage at 5:07-12.)  Defendant Qurishi caught up and tried to get his arms around Decedent, and Decedent got to the ground.  (Defs.' Qurishi Depo. at 33:18-34:11; Defs.' Qurishi Interview at 63:8-15.)  Defendant Qurishi requested an additional unit and told Decedent to "get up," intending to walk him back to where Ramirez was.  (CHP Vehicle Footage at 5:30-6:00.)  Defendant Qurishi did not attempt to handcuff Decedent, but decided to reposition Decedent because the ground was uneven and Ramirez was still on the sidewalk. (Defs.' Qurishi Depo. at 34:15-35:1, 35:20-36:37; Defs.' Qurishi Interview at 63:25-64:4.)

As Defendant Qurishi repositioned Decedent, Decedent went for Defendant Qurishi's feet, causing him to fall onto his back.  (Roistacher Decl., Exh. 3 ("Security Camera 2") at 12:38-48; Defs.' Qurishi Depo. at 37:7-9, 40:17-21; Defs.' Qurishi Interview at 65:16-17; Vivo Depo. at 27:2-4, 27:24-28:4.)  When Defendant Qurishi tried to stand back up, Decedent punched him and slammed him back onto the concrete.  (Security Camera 2 at 12:38-48.)  Decedent was able to gain a mounted position on top of Defendant Qurishi and began repeatedly punching him with closed fists to the head, yelling, "I'll kill you, nigga!"  (Security Camera 2 at 12:48-13:01; CHP Vehicle Footage at 6:17-20; Defs.' Qurishi Depo. at 40:6-9, 40:21-41:14, 51:5-20; Defs.' Qurishi Interview at 65:22-66:2.)  Ramirez described Defendant Qurishi and Decedent exchanging blows, with Defendant Qurishi blocking most of the blows although Decedent punched him three to four times.  (Valenzuela Decl., Exh. F ("Ramirez Depo.") at 89:17-24, 119:17-19, 120:6-7.)  Officer Perez-Rojas observed Decedent on top of Defendant Qurishi, punching him, while Defendant

1    Qurishi tried to defend himself by putting his hands up.  (Valenzuela Decl., Exh. G ("Pls.' Perez-

2    Rojas Interview") at 80:20-81:4.)  Vivo described Decedent as straddling Defendant Qurishi,

3    "coming down on top of the officer's head" with "both" fists in "rapid succession punching" "to

4    the head" while Defendant Qurishi "tr[ied] to curl up and protect himself[.]"  (Defs.' Vivo Depo.

5    at 28:10-23, 29:8-19.)  When asked if it was "fair to say [Decedent] was getting the better of the

6    officer on the bottom," Vivo agreed.  (Defs.' Vivo Depo. at 29:20-22.)

7         As Decedent continued to punch Defendant Qurishi in the head, Defendant Qurishi

8    removed his firearm.  (Defs.' Qurishi Depo. at 51:24-52:24.)  Defendant Qurishi stated he did so

9    "to prevent myself from being killed, to survive, to try and get him to stop [] delivering these

10   heavy, deadly blows onto my head/brain/skull area."  (Defs.' Qurishi Interview at 75:11-14; *see*

11   *also* Defs.' Qurishi Depo. at 52:2-3, 52:20-53:11.)  Defendant Qurishi did not consider the taser

12   given his close proximity to Decedent, as he could potentially tase himself or -- if he managed to

13   tase Decedent -- cause Decedent's locked up body to fall onto him.  (Defs.' Qurishi Interview at

14   83:2-10.)  He also did not consider using a baton while he was on the ground because a baton

15   required force.  (Defs.' Qurishi Interview at 83:12-16.)  Rather, Defendant Qurishi believed that

16   his firearm was his only option to survive due to the repeated blows to his head.  (Defs.' Qurishi

17   Interview at 83:20-24.)

18       After Defendant Qurishi removed his firearm, he started moving it towards what he

19   believed to be Decedent's general vicinity.  (Defs.' Qurishi Depo. at 57:5-9; Defs.' Qurishi

20   Interview at 76:1-15.)  Defendant Qurishi could not see if Decedent had a hand on his weapon, as

21   Decedent continued to strike Defendant Qurishi in the head.  (Defs.' Ramirez Depo. at 57:18-20;

22   Defs.' Qurishi Interview at 77:3-15.)  Ramirez and Vivo also observed that Decedent did not

23   attempt to grab Defendant Qurishi's firearm, instead continuing to throw blows near Defendant

24   Qurishi's head.  (Valenzuela Decl., Ex. E ("Pl.'s Vivo Depo." at 39:21-23, 42:20-12; Ramirez

25   Depo. at 116:23-117:10.)  Defendant Qurishi did not give a verbal warning before firing a shot,

26   hitting Decedent in the leg.  (Valenzuela Decl., Exh. C ("Pls.' Qurishi Depo.") at 55:11-56:14;

27   Defs.' Qurishi Depo. at 73:13-15; Defs.' Qurishi Interview at 76:9-15; Roistacher Decl., Exh. 26.)

28   After the shot, Defendant Qurishi felt like he was still receiving blows to the head, so he attempted

1  to pull the trigger again.  (Defs.' Qurishi Depo. at 62:25-63:10, 63:21-24; Defs.' Qurishi Interview

2  at 96:5-25.)  The gun jammed, and then Defendant Qurishi heard two more shots.  (Defs.' Qurishi

3  Depo. at 63:20-24, 64:3-6.)

4       Around this time, Officer Perez-Rojas had arrived at the scene after hearing a report about

5  the crash and three or four subjects running away from the vehicle.  (Roistacher Decl., Exh. 23

6  ("Defs.' Perez-Rojas Depo.") at 13:19-24, 15:5-12.)  Exiting the vehicle, Officer Perez-Rojas

7  heard someone saying, "Diego, stop! Diego, stop!"  (CHP Vehicle Footage at 6:17-26; Roistacher

8  Decl., Exh. 4 ("Perez-Rojas Body Camera") at 0:30-35; Defs.' Perez-Rojas Depo. at 19:5-9.)  He

9  saw Defendant Qurishi on the ground with Decedent mounted on top of him, "punching directly

10 down" at him with balled fists at least five times.  (Defs.' Perez-Rojas Depo. at 26:21-27:2, 69:15-

11 70:14; Roistacher Decl., Exh. 27 ("Defs.' Perez-Rojas Interview") at 24:3-11.)  Officer Perez-

12 Rojas saw Defendant Qurishi's head bouncing off the concrete when he was being punched, and

13 that Defendant Qurishi looked exhausted.  (Defs.' Perez-Rojas Depo. at 71:11-15, 73:10-13;

14 Defs.' Perez-Rojas Interview at 37:21-38:8, 41:22-24.)

15      Officer Perez-Rojas immediately radioed for help.  (Defs.' Perez-Rojas Interview at 25:1-

16 4.)  As he moved closer, he saw what appeared to be the silver pistol grip of a firearm and a pair of

17 hands fighting for the firearm.  (Defs.' Perez-Rojas Interview at 25:4-9.)  Officer Perez-Rojas

18 thought Defendant Qurishi might have been trying to get away from the firearm.  (Pls.' Perez-

19 Rojas Interview at 54:11-18.)  He then withdrew his firearm, yelling at Decedent to "get the fuck

20 off of him! I'm gonna fuckin' shoot you!"  (Perez-Rojas Body Camera at 0:36-39; Defs.' Perez-

21 Rojas Interview at 25:10-24.)  As he yelled, Officer Perez-Rojas heard the firearm go off, not

22 knowing if the shot was in his direction.  (Perez-Rojas Body Camera at 0:36-39; Defs.' Perez-

23 Rojas Interview at 44:8-17.)  Approximately two seconds later, Officer Perez-Rojas shot twice,

24 striking Decedent both times.  (Perez-Rojas Body Camera at 0:36-40; Defs.' Perez-Rojas Depo. at

25 23:10-14; Pls.' Perez-Rojas Interview at 55:10-12.)  Decedent's assault on Defendant Qurishi

26 immediately stopped as he fell to the ground.  (Pls.' Perez-Rojas Interview at 58:5-14; Perez-Rojas

27 Body Camera at 0:40-45.)

28      Defendant Qurishi stood up, and Officer Perez-Rojas asked if he was okay.  (Pls.' Qurishi

Interview at 38:3-6.)  Officer Perez-Rojas observed that Defendant Qurishi had a bruise to his forehead, his eyes looked a bit shaky, he could not keep his eyes straight, and that he was not acknowledging his presence.  (Defs.' Perez-Rojas Depo. at 76:18-23; Defs.' Perez-Rojas Interview at 30:10-12, 81:13-25.)  Defendant Qurishi replied he was good, but remembered being in shock and not entirely sure what was going on as he tried to go for his radio to tell dispatch what had happened.  (Pls.' Qurishi Interview at 38:6-17.)  Seeing that his gun was jammed, Defendant Qurishi unjammed it and reholstered his firearm before handcuffing Ramirez.  (Pls.' Qurishi Interview at 38:24-39:9.)  After that, Defendant Qurishi described himself as "walking around dazed and in shock at what's going on."  (Pls.' Qurishi Interview at 39:9-12.)  After additional units arrived, Defendant Qurishi recounted what had occurred.  (CHP Vehicle Footage at 9:15-10:00.)  Officer Hardin observed that Defendant Qurishi had multiple injuries to his face, including a black eye starting to form under his left eye, a large welt forming in the middle of his forehead, and additional bruising on his face.  (Hardin Decl. ¶ 22; *see also* Roistacher Decl., Exh. 29.)  Officer Hardin also described Defendant Qurishi as appearing to be in shock.  (Hardin Decl. ¶ 22.)

Defendant Qurishi was taken to the hospital, where he denied pain.  (Valenzuela Decl., Exh. I at 19.)  No loss of consciousness, nausea, vomiting, or difficulty breathing was observed. (Valenzuela Decl., Exh. I at 19.)  Defendant Qurishi was discharged approximately two hours after admission.  (Valenzuela Decl., Exh. I at 9.)  Defendant Qurishi was ultimately diagnosed with a concussion, muscle strain, neck sprain and strain, contusions, abrasions, bruising to the left eye socket and forehead area, and bruising and abrasions to his left hand.  (Roistacher Decl., Exh. 30 at 17; Exh. 31 at 1125.)

On December 14, 2023, Plaintiffs filed the instant action.  (Compl., Dkt. No. 1.) Following the stipulated dismissal of certain claims,[2] the following claims remain against Defendants State of California and Qurishi: (1) 42 U.S.C. § 1983 claim for excessive force, (2) § 1983 claim for violation of substantive due process (interference with familial relationship), (3)

---

[2] The parties stipulated to the dismissal of Plaintiffs' second claim under § 1983 for denial of medical care.  (Dkt. No. 70.)

battery, (4) negligence, and (5) violation of the Bane Act.

On October 15, 2025, Defendants filed the instant motion for summary judgment.  On November 12, 2025, Plaintiffs filed their opposition.  (Pls.' Opp'n, Dkt. No. 74.)  On December 2, 2025, Defendants filed their reply.  (Defs.' Reply, Dkt. No. 75.)

## II.    LEGAL STANDARD

A party may move for summary judgment on a "claim or defense" or "part of... a claim or defense." Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when, after adequate discovery, there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Southern Calif. Gas. Co. v. City of Santa Ana,* 336 F.3d 885, 888 (9th Cir. 2003).

On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may discharge its burden of production by either (1) "produc[ing] evidence negating an essential element of the nonmoving party's case" or (2) after suitable discovery "show[ing] that the nonmoving party does not have enough evidence of an essential element of its claim or defense to discharge its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000); *see also Celotex,* 477 U.S. 324-25.

Once the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 250.  "A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment. *Anderson,* 477 U.S.

at 254. "Instead, the non-moving party must go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001) (citations and quotations omitted). The non-moving party must produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NMS Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of material fact to defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Electronics Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255; *Hunt v. City of Los Angeles,* 638 F.3d 703, 709 (9th Cir. 2011).

## III.    DISCUSSION

### A.    Claim 1: Excessive Force (Defendant Qurishi)

#### i.    Qualified Immunity

Defendants assert that Defendant Qurishi is entitled to qualified immunity on the excessive force claim. (Defs.' Mot. for Summ. J. at 20.) "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation omitted). In determining whether qualified immunity applies, a court must first "decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Id.* at 232. A court then "must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct. Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Id.*

The Court finds that qualified immunity applies in this case.

##### a.    Constitutional Violation

In determining whether an officer used excessive force, the Court considers "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting

United States District Court
Northern District of California

them[.]" *Graham v. Connor*, 490 U.S. 386, 397 (1989).  This reasonableness test "is not capable of precise definition or mechanical application," but instead "requires careful attention to the facts and circumstances of each case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.  Further, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*  Thus, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Here, Defendant Qurishi shot Decedent once in the leg. The Court notes that Plaintiffs appear to dispute where Defendant Qurishi's shot struck Decedent, as they argue that the videos of the incident do not show where the shot struck and the autopsy report does not distinguish which gunshot wound was caused by which officer.  (Pls.' Opp'n at 9.)  This ignores the evidence that Defendant Qurishi's "bullet was recovered in the left pant leg of [Decedent]."  (Roistacher Decl., Exh. 26; *see also* Exh. 32 (autopsy report stating that bullet fragments were recovered in Decedent's pant leg).)  The parties also dispute whether Defendant Qurishi's shot contributed to Decedent's cause of death, as the medical examiner opined that she could not "say the one to the leg didn't contribute a little bit" to Decedent's death.  (Pls.' Opp'n at 10; Valenzuela Decl., Exh. J at 50:16-24; *but see* Roistacher Decl., Exh. 33 (expert report opining that gunshot wound to Decedent's leg was not fatal and did not contribute to his death).)  In any case, the Ninth Circuit has found that "shooting a firearm [is] by definition . . . 'deadly force': force that creates a substantial risk of causing death or serious bodily injury." *Seidner v. de Vries*, 39 F.4th 591, 596 (9th Cir. 2022) (internal quotation omitted).  Thus, the Court must determine the reasonableness of Defendant Qurishi's use of deadly force.

The first *Graham* factor considers "the severity of the crime at issue," which serves "as a proxy for the danger a suspect poses at the time force is applied." *Napouk v. L.V. Metro. Police Dep't*, 123 F.4th 906, 919 (9th Cir. 2024).  Here, Plaintiffs argue that the severity of the crime was

United States District Court
Northern District of California

"low-level" because the only crimes at issue were the speeding of the vehicle on the highway, the crash, and the occupants fleeing the vehicle after the crash.  (Pls.' Opp'n at 13.)  This wholly disregards the undisputed fact that at the time Defendant Qurishi shot Decedent, Decedent had repeatedly struck Defendant Qurishi in the head with closed fists while threatening to kill him.  Indeed, the security camera footage shows Decedent on top of Defendant Qurishi, punching him repeatedly, and the footage is consistent with the eyewitness testimony. (*See* Security Camera 2 at 12:38-13:01; CHP Vehicle Footage at 6:17-20; Ramirez Depo. at 89:17-24, 119:17-19, 120:6-7; Pls.' Perez-Rojas Interview at 80:20-81:4; Defs.' Vivo Depo. at 28:10-23, 29:8-22.)

The second *Graham* factor concerns "whether the suspect posed an immediate threat to the safety of the officers or others," and is "[t]he most important factor."  *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (internal quotation omitted).  "A simple statement by an officer that he fears for his safety or the safety [of] others is not enough; there must be objective factors to justify such a concern."  *Id.* (internal quotation omitted).  Again, there can be no dispute that when Defendant Qurishi shot Decedent, Decedent was on top of Defendant Qurishi, punching down at his head repeatedly with closed fists while threatening to kill him.  As a result, Defendant Qurishi suffered multiple injuries to his face, including a black eye and bruising to the face, a concussion, and muscle strain.  (Hardin Decl. ¶ 22; Roistacher Decl., Exhs. 29, 30 at 17, 31 at 1125.)

Plaintiffs concede that Decedent repeatedly punched Defendant Qurishi, but argue that there are material disputes of fact.  Specifically, Plaintiffs argue that Decedent never attempted to grab Defendant Qurishi's firearm, and that Defendant Qurishi did not sustain serious injuries because he never blacked out or lost consciousness.  (Pls.' Opp'n at 13-15.)  Viewing the evidence in a light most favorable to Plaintiffs, the Court will assume that Decedent did not attempt to grab Defendant Qurishi's firearm and that Defendant Qurishi did not black out or lose consciousness during or following Decedent's assault on him.

The third *Graham* factor looks at "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  "'Resistance,' however, should not be understood as a binary state, with resistance being either completely passive or active.  Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the

United States District Court
Northern District of California

individual who is physically assaulting the officer." *Bryan*, 630 F.3d at 830. Again, there can be no dispute that Decedent was actively resisting Defendant Qurishi, having previously fled the vehicle after it crashed, fled from Defendant Qurishi while he was trying to handcuff Ramirez, and then actively punching Defendant Qurishi in the head right before Defendant Qurishi shot him. (*See* Pls.' Opp'n at 15 (conceding that "Decedent attempted to flee and was resistive").)

Taking all of this together, the ultimate question is whether it was reasonable for Defendant Qurishi to use deadly force when he was being actively assaulted by Decedent with repeated downward punches to his head (resulting in a concussion, a black eye, and other facial injuries) after Decedent had attempted to flee. The Court finds that Defendant Qurishi's actions were plainly reasonable as a matter of law, and courts have found likewise under similar circumstances. *See Day v. Cnty. of Contra Costa*, No. C 07-4335 PJH, 2008 U.S. Dist. LEXIS 93487, at *36 (N.D. Cal. Nov. 10, 2008) (finding that the use of deadly force was reasonable where the decedent ran away, resisted arrest, and assaulted the officer, causing the officer to suffer scrapes and abrasions on his body and a bump on his head); *Estate of Adomako v. City of Fremont*, No. 17-cv-06386-DMR, 2019 U.S. Dist. LEXIS 104482, at *28-29 (N.D. Cal. June 21, 2019) (finding that the use of deadly force was reasonable where the suspect repeatedly slapped and punched the officer's head and shoulder with enough force to cause a black eye).

To the extent Plaintiffs argue there is a dispute of material fact as to whether Decedent attempted to grab Defendant Qurishi's firearm, the Court finds that this is not a material fact. As Defendants point out, Defendant Qurishi had already decided to use deadly force when he withdrew his gun, and Defendant Qurishi stated that he shot Decedent because he was being punched in the head. (Defs.' Qurishi Interview at 75:11-14; Defs.' Qurishi Depo. at 52:2-3, 52:20-53:11; Defs.' Reply at 17.) Thus, Defendant Qurishi's decision to use deadly force was not based on Decedent trying to grab his firearm. Plaintiffs also argue that Defendant Qurishi did not actually sustain serious injuries, as he never blacked out or lost consciousness. (Pls.' Opp'n at 15.) While the Court has significant doubt that Defendant Qurishi's injuries were not severe, this is again not a material fact. Plaintiffs cite no authority -- and the Court knows of none -- that would require an officer to *actually* suffer serious injuries before deploying deadly force. Further,

1    this does not change the undisputed fact that at the time of the shooting, Decedent was actively

2    punching Defendant Qurishi in the head with closed fists, which at the very least put Defendant

3    Qurishi in immediate danger of serious injury.  *Contrast with Day*, 2008 U.S. Dist. LEXIS 93487,

4    at *36-37 ("the actual amount of injury inflicted and whether Deputy Patzer was hit by Day or ran

5    into the air-conditioner are minor considerations in the totality of what transpired in the short

6    amount of time that Deputy Patzer pursued Day").  Similarly, Plaintiffs' argument that there is a

7    disputed question as to whether Defendant Qurishi tried to fire a second time is unavailing; there

8    is no dispute that Defendant Qurishi did in fact employ deadly force by shooting Decedent once,

9    such that it does not matter whether Defendant Qurishi tried to fire a second time.  (*See* Pls.'

10   Opp'n at 9.)

11          Separate from the *Graham* factors, Plaintiffs point to Defendant Qurishi's failure to give a

12   verbal warning before shooting.  (Pls.' Opp'n at 15.)  Plaintiffs, however, fail to cite to any

13   authority that Defendant Qurishi was required to give a warning in circumstances such as this,

14   where he was actively being punched in the head multiple times.  Plaintiffs also argue that

15   Defendant Qurishi had less lethal options, such as a taser or a baton, or that he could have waited

16   for another officer to assist.  (*Id.*)  While Defendant Qurishi had a taser and a baton, he explained

17   he did not consider the taser given their close proximity or the baton because he was on the ground

18   and could not generate sufficient force.  (Defs.' Qurishi Interview at 83:2-16.)  Plaintiffs provide

19   no argument or evidence to contradict Defendant Qurishi's statement that the use of less lethal

20   alternatives was actually feasible.  Moreover, the Ninth Circuit has acknowledged that "officers

21   are not required to use the least intrusive degree of force possible."  *Lowry v. City of San Diego*,

22   858 F.3d 1248, 1259 (9th Cir. 2017) (internal quotation omitted).  Finally, Plaintiffs argue that

23   Defendant Qurishi could have waited for backup as Officer Perez-Rojas had arrived at the scene.

24   (Pls.' Opp'n at 14.)  Plaintiffs, however, provide no evidence that Defendant Qurishi knew Officer

25   Perez-Rojas was there until Officer Perez-Rojas shot Decedent.  Indeed, Defendant Qurishi stated

26   that when he heard the two gunshots, he "freak[ed] out because . . . during this entire time I'm

27   thinking I'm all alone."  (Defs.' Qurishi Interview at 36:17-19.)  It was only after the shots were

28   fired that he saw Officer Prez-Rojas.  (Defs.' Qurishi Interview at 36:19-22.)  In any case, the

United States District Court
Northern District of California

12

1  Court is not aware of any authority that would require an officer to continue to be beaten in the

2  head while waiting for backup to assist.

3      Plaintiffs also rely heavily on the opinion of Roger A. Clark, who states he is "an expert

4  specializing in the procedures of police practices and proper police tactics, including proper

5  procedures for the detention and arrest of individuals and the type and degree of force, if any,

6  appropriate under different circumstances."  (Valenzuela Decl., Exh. A ("Clark Decl.") ¶ 1.)  Mr.

7  Clark opines that "[t]here was no immediate defense of life situation when Officer Qurishi fired

8  his lethal shots at [Decedent] because [Decedent] was unarmed and he had not attempted to grab

9  the officer's gun or disarm the officer of his gun."  (Clark Decl. ¶ 12.)  Mr. Clark further opines

10  that taking Defendant Qurishi down and "throwing several punches at him" is merely assaultive

11  conduct that does not constitute an imminent or immediate threat of death or serious bodily injury.

12  (Clark Decl. ¶ 12.)  Mr. Clark asserts that Defendant Qurishi could have used less lethal options

13  such as the taser or baton.  (Clark Decl. ¶ 14.)  Defendants, in turn, object to Mr. Clark's

14  declaration on multiple grounds, including that it is an opinion on the ultimate issue of law.

15  (Defs.' Reply at 9-17.)

16      The Court finds that Mr. Clark's declaration is largely speculative, and does not appear to

17  tie the facts to his opinions.  The Court observes that some of Mr. Clark's factual statements

18  appear incorrect, such as when he asserts that Defendant Qurishi fired "lethal shots" at Decedent --

19  there is no dispute that Defendant Qurishi only fired one shot.  (Clark Decl. ¶ 12.)  Mr. Clark also

20  focuses on the fact that Decedent was unarmed, but does not explain how Defendant Qurishi

21  should have known that; rather, Defendant Qurishi stated that he thought Plaintiff might have a

22  weapon because he was acting fidgety and reaching for his ankle area.  (Defs.' Qurishi Interview

23  at 62:3-10, 85:7-13; Defs.' Qurishi Depo. at 29:4-13.)  Thus, Mr. Clark's opinion appears to be

24  contrary to the law, which requires that reasonableness be determined without the "20/20 vision of

25  hindsight."  *See Graham*, 490 U.S. at 396.  Further, Mr. Clark's opinion that Defendant Qurishi

26  was not in immediate or imminent threat of death or serious bodily injury appears to be based on

27  his conclusory determination that Decedent throwing Defendant Qurishi to the ground and

28  throwing several punches at him is not immediately life threatening, yet does not acknowledge

1   that the closed fist punches were to Defendant Qurishi's head while Decedent was straddling him

2   nor explain why such punches did not create an imminent threat of serious bodily injury.[3]  (Clark

3   Decl. ¶ 12.)  Courts have found that similar opinions by Mr. Clark were speculative or improper

4   legal conclusions and could not be used to establish ultimate issues such as whether the use of

5   force was objectively reasonable.  *See Day*, 2008 U.S. Dist. LEXIS 93487, at *38-39 ("The gist of

6   Mr. Clark's opinion is that Deputy Patzer's life was not threatened, that his fear was imaginary or

7   subjective, and that he acted improperly in giving chase by himself.  While Mr. Clark is arguably

8   qualified as an expert in police practices, the court gives little weight to his opinions because of

9   their speculative nature."); *Acosta v. Cal. Highway Patrol*, No. 18-cv-00958-BLF, 2019 U.S. Dist.

10  LEXIS 105372, at *19-20 (N.D. Cal. June 24, 2019) (sustaining objections to Mr. Clark's opinion

11  that "there was no justification for the use of deadly force" and that the officers' response was not

12  "reasonable" as improper legal conclusions").  Likewise, Mr. Clark does not appear to connect the

13  circumstances to his opinion that Defendant Qurishi could have used his taser or baton; he does

14  not explain why Defendant Qurishi's concern that using a taser on someone so close to him was

15  unwarranted or explain how Defendant Qurishi could have used the baton when he was on the

16  ground being punched repeatedly in the head by someone on top of him.  In short, Mr. Clark's

17  declaration does not change the plain facts of this case -- namely that this was a rapidly evolving

18  situation where Defendant Qurishi had to make a split-second judgment while being actively

19  assaulted with punches to the head and having his life threatened.  Under such circumstances, the

20  Court finds that no reasonable jury could find that Defendant Qurishi's use of force was

21  objectively unreasonable.

22      Accordingly, the Court finds that Plaintiffs have failed to establish a constitutional

23  violation based on the undisputed facts of this case.

24          b.  Clearly Established Law

25      Even if there was a dispute of material fact as to whether Defendant Qurishi's use of

26

27  _____

    [3] As Defendants note, "it defies logic to say *the repeated punches [Decedent] was landing on
28  *Qurishi's face and head* don't create an immediate or imminent threat of, at the very least, a
    serious injury."  (Defs.' Reply at 19.)

1    deadly force was reasonable, Defendant Qurishi would still be entitled to qualified immunity

2    because there is no clearly established law finding otherwise.  "A right is clearly established when

3    it is sufficiently clear that every reasonable official would have understood that what he is doing

4    violates that right." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021).  In the context of Fourth

5    Amendment excessive force violations, "[s]pecificity is especially important . . . where it is

6    sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the

7    factual situation the officer confronts." *Id.* at 6.  Thus, "to show a violation of clearly established

8    law," a plaintiff must typically identify a case that puts the defendant "on notice that his specific

9    conduct was unlawful." *Id.*

10    Plaintiffs argue that they need not identify a case because they believe this is an "obvious"

11    case, *i.e.*, "where the unlawfulness of the officer's conduct is sufficiently clear even though

12    existing precedent does not address similar circumstances." (Pls.' Opp'n at 17; *District of*

13    *Columbia v. Wesby*, 583 U.S. 48, 64 (2018).)  The Court disagrees, given its conclusion that

14    Defendant Qurishi's use of deadly force was reasonable under the circumstances.

15    In the alternative, Plaintiffs point to *Hopkins v. Andaya*, 958 F.2d 881 (9th Cir. 1992) as

16    "mak[ing] clear that the use of lethal force against unarmed individuals who do not pose an

17    immediate threat of death or serious bodily injury to the officer's safety violates an individual's

18    Fourth Amendment right to be free of excessive force." (Pls.' Opp'n at 17-18.)  If anything,

19    however, *Hopkins* further demonstrates that Defendant Qurishi's use of deadly force was

20    reasonable.  There, the officer responded to a report that the suspect was creating a disturbance.

21    *Hopkins*, 958 F.2d at 883.  The officer searched the suspect and found he was unarmed but acting

22    strangely and talking to himself in an illogical manner.  The officer released the suspect, but later

23    heard him howling or braying under a traffic light.  When the officer approached the suspect, the

24    suspect became hostile and approached him in a threatening manner.  The officer testified that he

25    backed away, drew his baton, and began hitting the suspect's arms to keep him away.  The suspect

26    then grabbed the baton, causing the officer to fall backward and hit his head on the ground, dazing

27    him.  The suspect then hit the officer with the baton "at least ten times" before the officer was able

28    to get away, drawing his revolver and telling the suspect to stop.  Because the suspect kept

attacking, the officer shot him six times.  The officer saw blood and told the suspect not to move, but the suspect came at him again.  The officer was able to wrestle the suspect to the ground and get away, crossing the street and hiding behind a car.  When the suspect again advanced on the officer, the officer warned him to stop before firing four more shots.  Taking the officer's story as true, the Ninth Circuit found that the officer's use of deadly force the first time -- when the suspect had gotten hold of the officer's baton and was hitting him over the head, back, shoulders, and arms -- was justified, stating: "we can't really quibble with his use of deadly force to avoid being bludgeoned to death with his own club."  *Id.* at 887.  The Ninth Circuit, however, found that the second shooting was unjustified given that the officer was then being pursued by an unarmed civilian who he knew was wounded.  *Id.*

The instant case is far more akin to the first use of deadly force in *Hopkins*, where the officer was under active attack.  While Decedent did not have a baton, there is no real dispute that he was repeatedly punching Defendant Qurishi in the head, causing a concussion, a black eye, and other facial abrasions and scrapes.

In short, Plaintiff has failed to identify a case that would suggest that the use of deadly force in circumstances similar to the instant case is unreasonable.  Accordingly, the Court finds that qualified immunity applies, and that Defendants are entitled to summary judgment on the excessive force claim.

### ii.    Failure to Intervene and Integral Participant Theories

Defendants argue that even if Defendant Qurishi was not entitled to qualified immunity, Plaintiffs' failure to intervene and integral participant theories would fail because Plaintiffs have not pointed to any facts in support.  (Defs.' Mot. for Summ. J. at 27-31.)  As discussed above, the Court finds that qualified immunity applies to Plaintiffs' excessive force claim.  The Court notes, however, that Plaintiffs do not address the failure to intervene and integral participant theories in their opposition, let alone respond to Defendants' arguments regarding why these theories fail.  Thus, Plaintiffs have effectively abandoned an excessive force claim based on these theories.  *See Jenkins v. Cty. of Riverside*, 398 F.3d 1098, 1095 n.4 (9th Cir. 2005) ("Jenkins abandoned her other two claims by not raising them in opposition to the County's motion for summary

judgment."); *Sinsukthaworn v. Cty. of Napa*, No. 22-CV-04644-JSC, 2025 WL 1433821, at *10 (N.D. Cal. May 19, 2025) ("Because Plaintiffs' opposition only addresses the failure to train theory, Plaintiffs have abandoned their second cause of action for municipal liability under a ratification theory."); *Costabile v. Natus Med. Inc.*, 293 F. Supp. 3d 994, 1014 (N.D. Cal. 2018) ("Plaintiff has abandoned this theory by failing to respond to Defendants' arguments regarding it in his opposition to the motion to dismiss.").  For this separate reason, Defendants are entitled to summary judgment on the excessive force claim to the extent it is reliant upon the failure to intervene and integral participant theories.

**B.    Claim 3: Loss of Familial Association (Defendant Qurishi)**

Defendants move for summary judgment on Plaintiffs' loss of familial association claim, arguing that there is no predicate Fourth Amendment violation and that Defendant Qurishi's conduct does not "shock the conscience."  (Defs.' Mot. for Summ. J. at 31-32.)  The only mention of this claim in Plaintiffs' opposition is a cursory statement that the Court should deny the instant motion for summary judgment "because there are triable issues of material fact regarding the excessive force claim under the Fourth Amendment, Plaintiff's claim for interference with familial relationship under the Fourteenth Amendment, and Plaintiff's state law wrongful death claims for battery, violation of the Bane Act and negligence."  (Pls.' Opp'n at 2.)  Otherwise, Plaintiffs provide no substantive response to Defendants' arguments, including whether Defendant Qurishi's conduct "shocked the conscience and thus violated the plaintiffs' Fourteenth Amendment rights." *Ochoa v. City of Mesa*, 26 F.4th 1050, 1057 (9th Cir. 2022).  Accordingly, "the Court finds that Plaintiffs conceded this argument by failing to meaningfully address it."  *See Ganouna v. Colors You Like, LLC*, No. CV204070PSGGJSX, 2020 WL 6875176, at *4 n.1 (C.D. Cal. Oct. 14, 2020); *Mariscal v. Graco, Inc.*, 52 F. Supp. 3d 973, 984 (N.D. Cal. 2014) ("Defendant moves for summary judgment on Plaintiff's claims for breach of warranty. Plaintiff failed to address these arguments in his opposition brief, and therefore conceded these claims."); *Arroyo v. Sun Rise Prop. LLC*, No. SACV19952JGBGJSX, 2020 WL 5260493, at *3 (C.D. Cal. May 15, 2020) ("Plaintiff fails to address this argument in their Opposition, and therefore the Court considers Plaintiff to have conceded the point.").  Because there is no predicate Fourth Amendment violation

17

1    and Plaintiffs have failed to demonstrate that Defendant Qurishi's conduct shocks the conscience,

2    Defendants are entitled to summary judgment on the Fourteenth Amendment claim.

3        **C.**    **Claim 4: Battery**

4        Defendants argue that they are entitled to summary judgment on the battery claim because

5    the claim necessarily fails with a finding that Defendant Qurishi did not violate the Fourth

6    Amendment.  (Defs.' Mot. for Summ. J. at 32-33.)

7        In opposition, Plaintiffs argue that the standard for a battery claim is different from a

8    Fourth Amendment excessive force claim following the passage of California Penal Code § 835a.

9    (Pls.' Opp'n at 19.)  Plaintiffs cite no authority in support for this novel proposition, and the Court

10    has found none.  Rather, since California Penal Code § 835a's passage in 1957, both California

11    Courts of Appeal and the Ninth Circuit have repeatedly found that the standard for battery and a

12    Fourth Amendment excessive force claim are the same, including as recently as April 2025.  *Alves*

13    *v. Cnty. of Riverside*, 135 F.4th 1161, 1166 n.3 ("California battery claims are coextensive with

14    claims for excessive force under the Fourth Amendment."); *Murchison v. Cnty of Tehama*, 69 Cal.

15    App. 5th 867, 898 (2021) ("As to plaintiff's claims for battery by a peace officer and assault, the

16    standard for proving those state law claims is the same standard applied to section 1983 actions.");

17    *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527 (2009) ("A state law battery claim is a

18    counterpart to a federal claim of excessive use of force."); *Edison v. City of Anaheim*, 63 Cal. App.

19    1269, 1274 (1998) (applying § 1983 standard because § 1983 is "the federal counterpart of state

20    battery or wrongful death actions"); *Uzun v. City of Santa Monica*, 54 F.4th 595, 596 (9th Cir.

21    2022) ("Because we hold the officers did not use excessive force, we affirm summary judgment on

22    Uzun's battery claim.");  *Banks v. Mortimer*, 620 F. Supp. 3d 902, 935 (N.D. Cal. 2022) ("Courts

23    generally analyze [false arrest, battery, and negligence] claims under the same rubric as § 1983

24    claims based on the Fourth Amendment.").

25        Because the Court has already found that the use of force was reasonable as to the

26    excessive force claim, Defendants are entitled to summary judgment on the battery claim.

27        **D.**    **Claim 5: Negligence**

28        Defendants move for summary judgment on Plaintiff's negligence claim.  To establish a

United States District Court
Northern District of California

18

negligence claim, Plaintiffs must show: "(1) a legal duty to use due care; (2) a breach of that duty; and (3) injury that was proximately caused by the breach." *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1164 (N.D. Cal. 2009) (citing *Ladd v. Cnty. of San Mateo*, 12 Cal. 4th 913, 917 (1996)).  Notably, "negligence claims under California law encompass a broader spectrum of conduct than excessive force claims under the Fourth Amendment." *Mulligan v. Nichols*, 835 F.3d 983, 991 (9th Cir. 2016).  Specifically, an officer's "tactical conduct and decisions preceding the use of deadly force are relevant considerations under California law in determining whether the use of deadly force gives rise to negligence liability." *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 639 (2013).  Thus, "peace officers have a duty to act reasonably when using deadly force, a duty that extends to the totality of the circumstances surrounding the shooting, including the officers' preshooting conduct." *Id.* at 638.  That said, "as long as an officer's conduct falls within the range of conduct that is reasonable under the circumstances, there is no requirement that he or she choose the 'most reasonable' action or the conduct that is the least likely to cause harm and at the same time the most likely to result in the successful apprehension of a violent suspect, in order to avoid liability for negligence." *Id.* at 632.

Here, Plaintiffs simply repeat Mr. Clark's conclusory opinion that Defendant Qurishi was negligent because he: (1) did not wait for backup when he had both suspects prone on the ground, (2) did not try to handcuff Decedent when he was prone on the ground, instead standing him up and re-positioning him, (3) mistakenly believed Decedent was grabbing or attempting to grab his gun, (4) took out his gun during a physical altercation with Decedent, and (5) did not give a warning before shooting Decedent.  (Pls.' Opp'n at 21; Clark Decl. ¶ 15.)  As an initial matter, Mr. Clark's conclusory opinion that these actions were negligent is an improper opinion on an ultimate issue of law.  More significantly, neither Mr. Clark nor Plaintiffs explain how any of these actions constitute negligence such that Defendant Qurishi's use of force could be deemed unreasonable. For example, although Mr. Clark and Plaintiffs fault Defendant Qurishi for not waiting for backup, he does not explain why Defendant Qurishi's concern about there being two suspects (thus outnumbering him) and that they might "do[] something" was unreasonable or unfounded.  (*See* Defs.' Qurishi Depo. at 25:5-24.)  Likewise, with respect to Defendant Qurishi's decision not to

United States District Court
Northern District of California

1  handcuff Decedent when he was on the ground, Mr. Clark and Plaintiffs do not explain why

2  Defendant Qurishi's decision was unreasonable given that the ground was uneven and Ramirez

3  (who had previously confirmed that he had a knife) was still on the sidewalk.  (Defs.' Qurishi

4  Depo. at 34:15-35:1, 35:20-36:37; Defs.' Qurishi Interview at 63:25-64:4.)  It is also not apparent

5  that Defendant Qurishi actually believed Decedent was grabbing or attempting to grab his gun

6  when he decided to use deadly force, or that it played any role in his decision to use deadly force.

7  Finally, the Court has found that Defendant Qurishi was not unreasonable in taking out his gun

8  and using deadly force during the assault, and that Plaintiffs have not cited any authority that

9  Defendant Qurishi was required to give a warning under the circumstances.

10      In short, it is insufficient for Plaintiffs and Mr. Clark to simply list a number of

11  circumstances they believe were negligent without any further explanation or analysis.  Nor is it

12  the Court's responsibility to make arguments for them.  Even viewing the facts most favorably to

13  Plaintiffs, this is simply not a case where an officer's conduct "negligently provok[ed] a dangerous

14  situation in which the use of deadly force was then justified."  *Hayes*, 57 Cal. 4th at 632.  Rather,

15  in considering Defendant Qurishi's preshooting conduct in relation to his use of deadly force, the

16  Court still finds that his use of deadly force was reasonable.  Thus, Defendants are entitled to

17  summary judgment on the negligence claim.

### E.    Claim 6: Bane Act

19      Finally, Defendants move for summary judgment on Plaintiffs' Bane Act claim because

20  Defendant Qurishi did not commit a constitutional violation.  There can be no dispute that

21  "California's Bane Act requires proof of an underlying constitutional violation."  *Williamson v.*

22  *City of Nat'l City*, 23 F.4th 1146, 1155 (9th Cir. 2022).  The Court has explained why Plaintiffs

23  cannot establish that Defendant Qurishi used excessive force against Decedent, which is the only

24  constitutional violation cited by Plaintiffs in support of the Bane Act claim.  (*See* Pls.' Opp'n at

25  20.)  Accordingly, Defendants are entitled to summary judgment on the Bane Act claim.

### IV.    CONCLUSION

27      For the reasons stated above, the Court GRANTS Defendants' motion for summary

28  judgment.

The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated: December 19, 2025

_____
KANDIS A. WESTMORE
United States Magistrate Judge